EZEKIEL CLARK, Appellant, v. AMERICAN COAL COMPANY *et al.*, Appellees.

1. **Corporations**: STOCK AGREEMENTS: FRAUD. Where the fuel agent of a railway company, without its knowledge, agreed to become one of the incorporators of a mining corporation, from which, under said agreement, he was to make purchases of coal for said railway company, receiving at the same time compensation for his services as said agent, and dividends from said corporation, but it appeared that said agent's connection with said corporation proved beneficial in a financial way to said railway company, and that said company was given the preference over other railroad companies when the supply of coal was not equal to the demand, *held*, that the evidence failed to show that the stock issued to said agent was for a fraudulent purpose.

2. ———: ———: ———: PUBLIC POLICY: AVOIDANCE. Such a contract not being void as against public policy, and incapable of ratification, but voidable only, *held*, that the acts of said corporation, in pursuance of said contract, would not be set aside at the instance of one subsequently becoming a stockholder in said corporation, who had not been, and would not be, prejudiced thereby.

3. ———: STOCK CERTIFICATES: NEGOTIABILITY. A certificate of stock in a corporation is not a negotiable instrument.

4. ———: ACTS OF OFFICERS: USE OF CORPORATE FUNDS: VALIDITY. A resolution by the board of directors of a corporation ratifying the use of one hundred dollars per month of the company's funds by one of its officers for "special purposes," and authorizing such officer to continue to draw such sum monthly for the same purpose, *held*, not to be void as constituting a fraud upon the stockholders. it appearing that the money was used in connection with the company's business, and there being no evidence that it was used for an unlawful purpose.

5. ———: PROCEEDINGS OF DIRECTORS: INCREASE OF SALARIES: VALIDITY. An increase of the salary of an officer of a corporation, beginning with a date prior to such action by the board of directors, will not be invalidated by the fact that such officer was present at the meeting of the board, and voted upon such resolution, where it appears that the salary voted is less than the value of the services rendered, and that the vote upon said resolution was such as would have secured the same result had said officer not voted,

*Appeal from Mahaska District Court.*—HON. DAVID
RYAN, Judge.

WEDNESDAY, OCTOBER 19, 1892.

THE defendant company is a corporation, and this
action is to cancel five hundred shares of the stock held
by the defendant McNeil as void, because fraudulently
issued, and for an accounting for moneys expended by
the corporation. The decree was entered for the defend-
ants, and the plaintiff appeals.—*Affirmed.*

*C. C. & C. L. Nourse* and *Seevers & Seevers*, for
appellant.

*Blanchard & Preston, J. F. & W. R. Lacey*, and
*McNett & Tisdale*, for appellees.

GRANGER, J.—The defendant company was incor-
porated about April 23, 1884, with an authorized
capital of two hundred thousand dollars, for the
purpose of mining and selling bituminous coal. The
original incorporators were J. K. Graves, H. W. and
W. A. McNeil. Prior to the incorporation, E. J. Evans
and J. T. James were the owners of certain coal mines
and interests in Mahaska county, and J. K. Graves
and H. W. McNeil had a contract or option for the
purchase thereof. M. R. Wood, whose name appears
as a defendant, but on whom it is urged that there is no
sufficient service, was the fuel agent for the Chicago,
Rock Island & Pacific Railway Company, on whose
lines of road the coal mines in question were located.
Between Graves, the McNeils, and Wood, it was agreed
that the defendant corporation should be organized,
and should take from Graves and H. W. McNeil an
assignment of their purchase or option from Evans and
James, and pay therefor twenty thousand dollars in the
stock of the company. The property conveyed by

Evans and James consisted of interests in the Elida Coal Company and the Knoxville Coal Company, the property of the two companies consisting of coal lands and personal property appurtenant to the business of coal mining. The agreement by which Graves and McNeil secured the option specified that Graves and McNeil had organized a corporation "with appropriate powers, and the purchase shall be by the said corporation and in its name." The payment to Evans and James was to be as follows: The property of the corporation, consisting of that above described, was to be mortgaged to secure seventy-five thousand dollars of negotiable six per cent. bonds. Of these bonds fifty-seven thousand dollars were to be delivered to Evans and James in payment. By the agreement of sale by Evans and James it is provided: "In case of purchase under this option said Graves and McNeil will purchase fifteen thousand dollars of said bonds from Evans and James, and will pay cash in hand therefor; said bonds being those last maturing." It appears that the personal obligation of Graves and McNeil to purchase the fifteen thousand dollars of bonds was not discharged by them alone, but was assumed by the corporation under a verbal agreement in substance as follows: The corporation was to consist in fact of Graves, Wood, and the two McNeils. Graves and McNeil had made no payments whatever. The fifteen thousand dollars for the purchase of bonds was raised by Graves and the McNeils, each paying five thousand dollars. The twenty thousand dollars of bonds agreed to be delivered to Graves and McNeil were to be shared by the four parties interested, and certificates of stock issued therefor, each party receiving five thousand dollars thereof, except that the five thousand dollars for Wood was delivered to and held in trust by H. W. McNeil for him, to be delivered whenever, from the dividends on the stock, after certain other payments, Graves and the McNeils

should each be repaid his five thousand dollars and interest, so that each of the four should stand equal as to expenditures. After such payments it was agreed that Wood should share equally in dividends, including the fifteen thousand dollars of bonds purchased from Evans and James. These certificates were issued in May, 1884. It will be noticed that, after these certificates were issued, there was remaining of the authorized capital of the corporation one hundred and eighty thousand dollars unrepresented by certificates. In November and December, 1884, the corporation issued what are called "stock dividends" for this balance, one-fourth thereof going to each of the four interested, except that the certificates for Wood were delivered to H. W. McNeil in trust, as was done with the former certificate. From the business of the corporation dividends were declared in December, 1884, March, 1885, and January, 1887, in the aggregate fifteen thousand, two hundred and thirty-nine dollars, and paid to Graves, H. W. and W. A. McNeil, to reimburse the amounts paid by them in the purchase of the fifteen thousand, dollars of bonds; and thereafter, as we understand, Wood became, under the agreement, the owner of the stock held in trust for him. The name of Mr. Wood nowhere appears on the books of the corporation as a stockholder or otherwise. At this time J. K. Graves was president, H. W. McNeil was vice president and general manager, and these two, with W. A. McNeil, constituted the board of directors of the corporation, and the entire stockholders, aside from M. R. Wood. The business management for some time devolved on H. W. McNeil, after which it was transferred to W. A. McNeil, who still continues as manager. From the commencement of the business of the corporation there was paid to Graves and the two McNeils each one hundred dollars per month, which payments continued until after the fifteen thousand dollars was repaid, when

it was likewise paid to Wood. There was also voted and paid to W. A. McNeil an increase of one hundred and sixty-six dollars and sixty-six cents per month, because of his supervision and management of the business of the corporation. In the dividends of the corporation, aggregating thousands of dollars, Mr. Wood always shared equally with the others to about May 3, 1889, when he assigned his stock to W. A. McNeil. April 26, 1889, the plaintiff obtained from H. W. McNeil one hundred and fifty shares of stock, and in May thereafter he purchased from the First National Bank of Chicago, Ill., two hundred and fifty shares of the stock formerly owned by J. K. Graves, and now claims to be the owner of seven hundred shares of the stock of the corporation.

The plaintiff's complaint is, in brief, that the issue of stock and the payment of salaries and dividends to M. R. Wood are solely in consideration of his relation to the railroad company as fuel agent, "and to interest him in the profits and earnings of said American Coal Company, and to influence his action in making contracts between said railway company and said American Coal Company, and that the same is fraudulent and against public policy." He also complains of the action of the corporation in voting the salaries or dividends and payments to Mr. Wood, and to some extent to W. A. McNeil, and of voting one hundred dollars per month to W. A. McNeil, to be used by him for "special purposes." Referring to the assignment of the five hundred shares by Wood to W. A. McNeil, the plaintiff in his petition says:

"Thirteenth. Plaintiff avers that, by virtue of the exercise of the authority to vote said five hundred shares of the capital stock of said company, the defendant W. A. McNeil has controlled the election of directors, and has elected himself and his brother members of the

board of directors, and that two directors is a majority of said·board, and that the articles of incorporation vest the management of its affairs in a board of three directors.

"*Fourteenth.* Plaintiff further shows that, by virtue of the use of the fraudulent stock at the election of the directors, by the said W. A. McNeil, he has excluded this plaintiff from any voice in the affairs of said company, and has elected a majority of the board wholly under his will and· control. That his brother, elected a member of the board as aforesaid, holds only one share of stock in said·company, which share was gratuitously transferred to him by the said W. A. McNeil for the sole purpose of making him eligible as a director."

The prayer of the petition is that the five hundred shares of stock be canceled and declared null and void, and that the defendants McNeil and Wood be required to account for the money fraudulently received and expended.

Barring the question of public policy, it will be observed that the relief sought is founded on a denial of the right of W. A. McNeil to cast the vote based on the ownership of the five hundred shares of stock assigned to him by Wood. If the stock in question is entitled to representation in the business affairs of the corporation, the plaintiff is entitled to no relief in this proceeding, because the legality of the payments and proceedings complained of depend upon the integrity of the stock issued to Wood. Although there is some complaint, particularly in argument, as to the legality of proceedings by the board of directors, in some other particulars, we find nothing to stand as a basis for relief independent of the question of the validity of the stock. The argument of the appellant is based upon queries or propositions which it may be well for us to adopt in our consideration of the case.

I. "Was the stock issued for a fraudulent pur-

pose?" As a question of fact, under the evidence, we
answer in the negative. What the law,
regardless of facts, might impute to such
a transaction, in a case where the question
of public policy was legitimately involved, may be
noticed hereafter.

1. CORPORATIONS:
stock agree-
ments: fraud.

What purpose or motive would and should be
imputed to the mere fact that Wood, as fuel agent for
the railway company, without its knowledge, agreed to
become a member of the corporation from which, as
such agent, he was to make purchases of coal, receiving
at the same time a compensation for his services as
agent, and dividends from the corporation, as a mem-
ber of it, is not open to question. It would be unhesi-
tatingly declared a fraud. But this is not to say that
other evidence may not show that the parties acted
without such a purpose. If there was a fraudulent pur-
pose, in fact, it must have been shared in by Wood,
Graves and the McNeils, who were all the parties inter-
ested in the corporation; hence the fraud, if intended,
was against the railway company. During the time
Wood was, in fact, a member of the corporation, such
membership was unknown to the railway company,
barring possibly a short time near the close. No fraud-
ulent purpose could have been intended against the
company, except in the sale of coal to it. The corpora-
tion during this time continued to furnish coal to the
company in quite large amounts, and in the record
there is nowhere a pretense of unfair or fraudulent
dealings. The record justifies the conclusion that the
railway company was, in a financial way, benefited,
rather than defrauded, as a result of the corporate
organization, for it obtained coal from the American
Coal Company for less than it paid at other mines
under similar circumstances, and paid to the American
Coal Company the same price per ton as was paid to it
by the Chicago, Milwaukee & St. Paul and the Union

Pacific Railway Companies. In the transaction the Rock Island road secured the advantage of being preferred when the supply of coal was not equal to the demand, which fact seems to have been quite important, as a failure of supply, before the organization of the American Coal Company, to some extent, at least, led to the suggestion by Mr. Wood that the present company should be organized, with increased facilities for meeting the demand. It is certainly possible that the parties, at the organization, designed only to secure the patronage of the railroad company because it was necessary and important, being an average of about one hundred and thirty-five tons per day, but that in so doing no more was intended than strict integrity and fair dealing would warrant. Nothing seems to have intervened to change the original purpose in this respect, and it is fortunate that we can determine that purpose in the light of subsequent events and results. These events and results are in harmony with an honest purpose. The appellant, in arguing this query, relies upon facts and figures showing the results to Wood because of his salary from the railway company and his receipts from the coal company. But who was defrauded because of that? Not the railway company, for there is no complaint of the services rendered for it. It was no fraud as to the coal company, for it was done by the assent of every officer and stockholder of the corporation when the stock was issued. The dividends and payments were from legitimate earnings of the corporation, and proper funds for such disposition.

II. "Was the contract void, as against public policy, and therefore incapable of ratification?" We think the contract at its inception was against public policy, and voidable at the instance of a party prejudicially affected thereby. We do not, however, think the plaintiff is

2. —: —: —:
public policy:
avoidance.

such a party. Were the conditions now such that, because of the reasons for which the contract might be declared against public policy, the plaintiff was liable to prejudice, the courts would not wait for prejudice to result before granting relief, but would grant the relief to avoid the prejudice. In May, 1889, Wood disposed of his stock, and has not since been connected with the corporation. Nothing in the present organization is against public policy, nor is there anything to satisfy us that the plaintiff has been at any time in the least prejudiced because of Wood's connection with the corporation. Because the contract was in the first instance voidable is no reason for now saying that all acts done in the organization of the corporation, its business, and the disposition of stock and dividends, must be declared void, without some reason for so doing; and it may well be said, in this connection, that the plaintiff is not seeking to have the contract declared void. The contract, if void, would go to the entire transaction of incorporating, for it lies at the very foundation of it, and would nullify the entire issue of stock, including that of the plaintiff. Of course, we mean, in this connection, if the contract was void, not voidable. A void thing is no thing, and that is a broader rule than is asked to be applied. If voidable only, then the case of *Oscanyan v. Arms Co..*, 103 U. S. 267, is without application, as well as *Coppell v. Hall*, 7 Wall. 542. Both are cases in which there was an effort to enforce an absolutely void contract. The only ground upon which the contract of organization in this case is contrary to public policy is the relationship of Wood to the two companies, and the ignorance of the railway company of his action. Nothing in the law prohibited such a relationship, with the assent of of the railway company, and hence the distinction between the cases. The governing principle of this case is like that discussed by Mr. Justice DILLON in

*Buell v. Buckingham*, 16 Iowa, 284.   Our conclusion is that the contract was not so void, as against public policy, as to be incapable of ratification if a ratification was necessary to give it life.

III. "Was the issue of the stock *ultra vires,* and void, and incapable of ratification; and has the *bona fide* purchaser of stock a right to have it canceled?"   It seems to us that this point is urged under a clear misapprehension of the facts of the case.   The argument speaks of there being no consideration for the five hundred shares issued to Wood.   There was the same consideration for these as for the shares issued to the other three parties.   Neither gave a dollar for his stock.   Three of them advanced five thousand dollars each, but under an agreement with Wood that it was advanced for him as well as for themselves, and, when repaid, all were to be equal in their rights and privileges.   That agreement was observed, and the stock delivered to Wood after the repayment, so that all were equal in their expenditures.   The money was not advanced for stock, but it was in effect a purchase of the bonds of the corporation secured by a mortgage on its plant, and the payment of the money by the corporation was upon its obligation.   It may be well to notice the question of the plaintiff being a *"bona fide* purchaser of stock," so as to entitle him to have the stock canceled.   His first purchase of stock was April 26, 1889.   The following letter, written nearly a week before, will indicate something of his knowledge of the situation of the corporation before making the purchase, and his purpose in so doing:

> "IOWA CITY, IOWA, April 20, 1889.

*"J. K. Graves:*

"DEAR SIR:—For value received, I agree to work solidly with you to protect our mutual interests in the coal business generally at Oskaloosa, and especially in

8. ——: stock certificates: negotiability.

the American Coal Company, and you and I will vote together and build up our interests as against any and all influences, and from any funds therefrom coming to me I will loan you the use of one-half thereof, should you need same in liquidation of your affairs. We will retire W. A. McNeil from all connection with the business, and aim to make the management profitable and satisfactory. We—you and I—will stand together, and, if need be, fight together for each other.

"[Signed]                               E. CLARK."

H. W. McNeil testified that, about 1887, he rode with the plaintiff over the property of the corporation, and told him of its history and Wood's connection with it. This the plaintiff, in evidence, denies, so far as concerns the relations of Wood to the company. Mr. Graves, between whom and the plaintiff a mutuality of interest was sought, and seems to have since existed, was entirely familiar with the entire business of the corporation and the relation of Wood thereto. That Mr. Graves, considering the friendly alliance, would have permitted the plaintiff to purchase the stock in ignorance of so important a matter as to who was owner of a one-fourth interest in the plant, and upon whom so much reliance was placed to secure the patronage of the railway company, its greatest source of profit, seems quite incredible. Again, it seems that the plaintiff was himself so apprised of a situation requiring, in his judgment, a combination to "fight together," and retire the present manager "from all connection with the business," that the most ordinary prudence would have led to an inquiry as to the cause for such a situation, and such an inquiry would certainly have disclosed the fact of Wood's interest, which, in this case, is declared to be the means by which the mismanagement is carried on. Were the rule in such a case that an innocent or *bona fide* purchaser of such stock should have equities not to

be granted to his assignor, we do not think the plaintiff would come within the rule. Such certificates, however, do not afford such protection. See *C., R. I. & P. Railway Co. v. Howard*, 7 Wall. 392. In Cook on Stockholders and Corporation Law, section 412, is the following: · It is very clear, and it is well established, that certificates of stock are not negotiable instruments. A certificate of stock is not a promise or order to pay money, nor has it any of the essentials of a negotiable instrument. Moreover, it has been repeatedly decided by the courts that a certificate of stock is not negotiable, and no custom of trade or of brokers can give it that character." See, also, *Mechanics' Bank v. New York & N. H. R'y Co.*, 13 N. Y. 599, and *Shaw v. Spencer*, 100 Mass. 382.

IV. It is said: "The stock was not issued by authority of any vote of the stockholders or directors, and was not ratified by any official act of either." This is a clear misapprehension. The following is in the record as to the action of the board of directors on November 12, 1884, after which the certificates issued: On motion it was unanimously resolved that a stock dividend of nine hundred per cent. be declared upon the capital stock of the company, payable at once, thus making the outstanding stock two hundred thousand dollars." The claim that the issue of stock was the unauthorized act of the president is not sustained by the record.

V. "Any agreement antedating the organization was not authority to the president to issue the stock." The stock, as we understand, was not issued on the authority of any agreement antedating the organization. The agreement undoubtedly led to the organization, and thereafter, upon authority of the corporation, the stock issued.

VI. "All disbursements made or ratified, subsequent to the date that plaintiff, or the bank from which he

purchased, and that were fraudulent and
unauthorized, should be accounted for by
the defendants, and future payments of the
same character enjoined; and all votes of
directors to increase their own compensation, or ratify
their past conduct, are fraudulent and void.'' On the
twenty-sixth day of April, 1889, there was a meeting
of the board of directors, at which Graves and both
McNeils were present, being the entire board, and the
following resolution was unanimously adopted, as
appears from the records of the corporation: "On
motion, resolved that one hundred dollars per month of
the amount drawn from these funds since February 1,
1888, by W. A. McNeil, manager of this company,
which has been used for special purposes in connection
with the sale of coal, be ratified to date, and W. A.
McNeil is authorized to continue to draw one hundred
dollars per month, in addition to his salary, for same
purpose, until instructed to the contrary by the board.
From the same record it also appears that the salaries
of the officers were fixed, and among them was
that of Vice President and General Manager W. A.
McNeil, at two hundred and sixty-six dollars and
sixty-six cents per month "from January 1st last."
The proposition has reference to these acts by the
board of directors. It appears from the record that
the one hundred dollars per month to be drawn by W.
A. McNeil was to be used for special purposes in the
sale of coal. Surely the corporation had the right
to so use its money. It does not appear that it was for
unlawful purposes. Mr. Graves, in his testimony,
says it was to be paid to Wood; but might it not be
paid to him legitimately? We cannot assume that it
was not, and the disposition, assuming that the board
knew of the intended use met the unanimous approval
of the board of directors. This action was on the
very day the plaintiff obtained his first stock, but

4. ——: acts of officers: use of corporate funds: validity.

whether before or after does not appear; whether it was before or after, however, would seem to be immaterial.

VII. As to voting the salary to W. A. McNeil, it is said in argument that the law will not permit a a director to vote on a question in which he has a personal interest, "and his vote so given is fraudulent and void." We find no case in which the rule as stated is sustained when the facts are as in this case. Here W. A. McNeil was properly made a director of the corporation. The board of directors made him general manager of the business of the corporation. As such he was entitled to compensation. It was the duty of the board to fix this compensation, both for past and future services. It did so, and by a vote that, independent of that of W. A. McNeil, would have given the same result. It was unanimous. The salary voted was, as the record shows, less than the services were worth. No person was defrauded or in any manner wronged. It was not a case of "voting back pay," but of providing for the conduct of the business of the corporation and paying its debts. The vote cast by W. A. McNeil did not render the proceedings void. If he had not voted, the result would have been the same. But, upon the question of his right to vote, see *Buel v. Buckingham*, 16 Iowa, 284, and authorities cited.

By way of general comment, and as bearing on the equities of the case, it may be well to say that, in our judgment, the plaintiff is without any equities demanding relief. It is seldom that a case of this magnitude is so manifest in this respect. Referring to the claim for the cancellation of the stock, it may be said that the plaintiff made this purchase of seven hundred shares on the basis of the plant being repre-

5. ——: proceedings of directors: increase of salaries: validity.

sented by certificates for two thousand shares, and what he paid for was his proportion on such a basis. The cancellation asked would reduce the stockholding interest one-fourth, and increase the value of his stock in such a proportion, as it would, of course, the proportion of each of the others. This, with the letter to Mr. Graves before he made the purchase of stock, expressing a purpose to vote and work solidly to build up their interests, "as against any and all influences," is highly indicative of his purpose when he entered the corporation. The plaintiff, without the cancellation, has exactly what he purchased, and in the condition it was known, or should have been known, to be in. The management was good, in the way of improving the plant, increasing the business, paying off the debts of the company and realizing a surplus for dividends. No stockholder or creditor has ever had just grounds for complaint. The case of *Dimpfell v. Ohio & Miss. R'y Co.*, 110 U. S. 209, 3 Sup. Ct. Rep. 573, is of such similarity to this, and the remarks therein are so applicable, that we are justified in quoting from the opinion as follows. Speaking of the plaintiff in the case, the opinion says: "Callaghan, another stockholder, is the only one who joined him. The two claim to be the owners of one thousand, five hundred shares of the stock of the company. The whole number of shares is two hundred and forty thousand. The owners of the balance of this large number make no complaint of the transactions which the complainants seek to annul, and it does not appear that the complainants owned their shares when these transactions took place. For aught we can see to the contrary; they may have purchased the shares long afterwards, expressly to annoy and vex the company, in the hope that they might thereby extort, from its fears, a larger benefit than the other stockholders have received, or may reasonably expect, from the purchase,

or compel the company to buy their shares at prices above the market value. Unfortunately, litigation against large companies is often instituted by individual stockholders from no higher motive."

The plaintiff is without legal or equitable grounds for relief, and, as this was the view of the district court, its judgment is AFFIRMED.