JOHN V. AND CHARLES B. FARWELL v. MARGARET ANN BABCOCK, ADMINISTRATRIX, AND MORRIS B. BROWN.

Decided November 18, 1901.

1.—Receivers—Appointment—Appeal from Order Appointing—Notice.

An appeal from an interlocutory order appointing receivers, made in chambers on ex parte hearing, is properly taken when the order of appointment is filled with the clerk, although not yet entered on the minutes of the court, and although no notice be given in open court of appeal from such order. Revised Statutes, arts. 1465, 1385, 1387, construed.

2.—Same—Right of Appointment.

The right to the appointment of a receiver of a corporation is not a cause of action, but only an ancillary right thereto, and if, when application is made for a receiver, it is not shown that applicants have a cause of action, no right exists to have the receiver appointed.

3.—Same—Corporation—Contract with Its Directors Only Voidable.

Contracts made by a corporation with a minority of its directors are not, as a general rule, void for that reason, but voidable only, even though such minority may have used their position and superior influence to advance their individual interests.

4.—Same—Management of Corporations—Interference by Court.

Mismanagement, neglect, or abuse of discretion on the part of officers of a

corporation in their conduct of its business will not authorize the courts to interfere on behalf of minority stockholders to set aside contracts which are not void, unless there is plainly shown an intention to sacrifice the interests of the corporation and the minority stockholders.

**5.—Same—Appointment of Receivers Not Warranted.**

See petition in an action by minority stockholders of a corporation to set aside as fraudulent and void a lease of all its property made by its board of directors to a minority of its own members, and for a winding up of the corporate affairs, which is held not to authorize the appointment of receivers, because not showing a cause of action.

**6.—Fraud Avoiding Written Instrument—Necessary Allegations.**

A party is held to a knowledge of the contents of an instrument he has signed, unless it is shown that the adverse party practiced some fraud, misrepresentation, or deceit whereby he was misled or misinformed as to its contents, and was thus induced to sign it in ignorance of its contents; and such facts must be alleged in an action seeking to avoid the effect of the instrument. See compromise agreement between stockholders of a corporation containing a clause herein sought to be avoided, ratifying former leases and contracts made by the corporation.

Appeal from Hartley. Tried below before Hon. H. H. Wallace.

*Tenney, McConnell, Coffen & Harding* and *Matlock, Miller & Dycus,* for appellants.

*Bomar & Bomar* and *A. M. Carter,* for appellees.

HUNTER, ASSOCIATE JUSTICE.—This is an appeal by John V. Farwell and Charles B. Farwell, two of the defendants, from an interlocutory order of the district judge of Hartley County appointing receivers for the property of the Capitol Freehold Land and Investment Company, Limited, a corporation organized under the laws of England, consisting of about 3,000,000 acres of land lying in what is called the Panhandle of Texas, along the northwestern border thereof, embracing most of the counties of Dallam, Hartley, Oldham, Deaf Smith, Parmer, Castro, Bailey, Lamb, and Hockley, and extending a distance of about 200 miles north and south, and about 120,000 head of cattle running and ranging thereon, together with the horses, mules, wagons, and all improvements and appurtenances belonging to said company and in use on said ranch, which is said to be the largest in the world. The order covered property worth $10,000,000, which has been in the undisputed possession of appellants for twelve years. The petition was filed by complainants on the 23d day of July, 1901, and the order made by the honorable district judge at chambers afterwards on the same day, and without notice to any of the defendants, on the ex parte statements, exhibits, and affidavits of the complainants and their counsel.

The petition was filed by Mrs. Margaret A. Babcock in her individual capacity, and as executrix of the will of her husband, Amos C. Babcock, deceased, and Morris B. Brown, resident citizens of Cook County, Illinois, who bring the suit on behalf of themselves and all other minority stockholders of the Capitol Company similarly situated to them-

selves, and for the use and benefit of said Capitol Company. They complain of John V. Farwell, Charles B. Farwell, and Abner Taylor, resident citizens of Cook County, Illinois, and whom they denominate "the syndicate," and of the Capitol Company aforesaid, whose principal office is in London, England, with John V. Farwell, its managing director in the United States, with an office in Chicago.

It is alleged that Morris B. Brown owns of the Capitol Company's stock 180 ordinary shares of £2.10s. each, and 180 deferred ordinary shares of £7.10s. each, and that he has owned the same since December 8, 1897; that Mrs. Babcock is the owner of 7458 ordinary shares and 7738 deferred ordinary shares; that said Capitol Company was organized in 1885 by the two Farwells, Abner Taylor, and Amos C. Babcock, who were contractors with the State of Texas for the erection of its present State capitol building at Austin, Texas, and for which they were to, and did, receive the 3,000,000 acres of land aforesaid; that said Capitol Company was chartered and organized for the purpose of acquiring these lands and developing and maintaining them as a cattle ranch, and for the acquisition, raising, and breeding of cattle thereon and the doing of a general ranching business. There were nine directors, five of whom were residents of Great Britain, and the remainder of the United States; that the two Farwells and Abner Taylor own, and from the beginning have owned, a controlling interest in the capital stock of said company,—about three-fourths thereof,—and have from the organization of the company been directors therein, and the said John V. Farwell has been the managing director in the United States; that substantially all of the British directors were made so at the instance and request of the Farwells and Taylor, and it is alleged (on information and belief) that the syndicate gave them stock in the company in order to qualify them to be directors, and as an inducement to secure their assistance in organizing the company; that at all times the board of directors of said company has been in a great degree controlled, influenced, and dominated by the syndicate.

That soon after the organization of the company, bonds, or, as they are called by the Englishmen, debentures, were issued by the company and sold to the amount of £1,000,000, which bonds were secured by a mortgage lien on all the lands and property then owned by the company or afterwards to be acquired. These bonds matured from five to ten years after their dates, and bore interest—some at 5 per cent and some at 6 per cent per annum. They were sold, it seems, principally in Great Britain, at par, and £600,000 of the proceeds were paid to the syndicate for the lands aforesaid, and £400,000 were to be used to improve the lands and purchase cattle, horses, wagons and ranch equipage, etc. It is then alleged (on information and belief) that only a portion of the latter sum was used for the purpose indicated, and the balance was retained by the syndicate and unaccounted for.

That the first annual meeting of the stockholders and directors was held on January 1, 1887, and the minutes of that meeting show a re-

port from John V. Farwell of the business of the company to October 31, 1886, which discloses that he had on the ranch 69,423 head of cattle, and had contracted for 41,298 head more, and that the profits accruing from the business to that time was £18,706.1s.5d.; that the next annual meeting was held on February 1, 1888, and the report of the managing director aforesaid showed that, from October 31, 1886, to October 31, 1887, the losses of cattle were 2 per cent of the herd; that the company had on its ranch 109,807 head of cattle, valued at £400,000, and that the net profits of the business up to October 31, 1887, made a total of £20,723.5s.1d.

That the next annual meeting was held on March 12, 1889, and the report of John V. Farwell showed that the total amount of bonds sold up to December 31, 1888, was £738,792, and that he had sold from the ranch 30,339 head of cattle for the sum of £154,514.10s., and that the net profits of the company after paying all expenses, interest, etc., was the sum of £23,334, and that he had expended on said ranch up to said date in fencing, buildings, reservoirs, wells, tanks, etc., £114,429.18s.1d.; and that the company had on hand in cash £44,230.3s.11d., of which £40,636.7s.1d. was in possession of John V. Farwell, and there was 95,926 head of cattle worth £337,363, and that the profits up to said date in American money had been $113,168.

It is then averred that about this time, January 1, 1889, the said syndicate "realizing the great possibilities of profit to be derived from said business, became covetous, and conceived and put into execution a well laid plan looking to the ultimate conversion of the assets of said company to their own use and benefit to the exclusion of your petitioners and the other non-syndicate stockholders," and, in pursuance of said plan, it is averred that, on March 27, 1889, the said syndicate caused the company to execute to them "a pretended and fraudulent lease on all of said company's lands, cattle, and other personal property in Texas for a period of five years, beginning on the 1st day of January, 1889." This lease is set out in the petition, as well as all the others hereinafter named, and in substance provided that the entire property of the company should be turned over to the syndicate for five years; they agreeing, in effect, to pay certain rentals and keep up the herd to 150,000 head, and pay all ranch expenses, interest on the bonds, etc., and were to be allowed to sell steers over three years old, surplus bulls, and fat cows to repay themselves for moneys paid out.

The next contract was dated July 29, 1892, and took the place of the former one. In this, however, the syndicate guaranteed the interest on the bonds, and continued to operate the ranch.

The third was dated February 22, 1893, and was somewhat similar to the others, but provided for a reissue of bonds at a lower rate of interest, the syndicate guaranteeing the interest on them, and agreeing to transfer to such of the bondholders of the 4 per cent bonds paid up capital stock in the company to the amount of 25 per cent of the face value of such bonds as additional security to their guarantee, and to the

mortgage which was to be given to certain named trustees on all the property of the company to secure all the bonds named.

The fourth and last contract was dated July 12, 1894. It is alleged that all of these contracts were fraudulent, null and void, and that they were made with the syndicate while they were directors of the company, and that the result of them is to deprive the plaintiffs of any dividends or profits of the business until the bonds of the company aforesaid are paid off in full, and many other complaints are made against the syndicate; but all of them, where full enough to make a charge of fraud or oppression, are of such character as to render the acts and contracts voidable only, and not void, and being voidable only could, of course, be ratified by the plaintiffs and made as valid against them as if no fraud or other wrong had entered therein.

This petition was sworn to in Chicago, July 20, 1901, and filed with the district clerk of Hartley County, July 23, 1901, and the order appointing J. V. Goode, of Tarrant County, and W. H. Fuqua, of Potter County, receivers, was made in chambers and filed with the clerk on the same day. The receivers' bonds in the sum of $100,000 each were approved by the district judge on the 24th day of July, and the oath required by law was administered to the receivers by him on the same day, and the bonds were filed with the clerk on the 25th. The order was not entered on the minutes of the court and signed by the judge, but was made out on a separate sheet of paper and officially signed by the judge and filed among the papers of the cause by the clerk on July 23, 1901.

On the 29th day of July, 1901, the following proceedings were had:

"Mrs. Margaret Babcock et al. v. Capitol Freehold Land and Investment Company, Ltd., et al. No. 130.—Suit pending in the District Court of Hartley County, Texas: Be it remembered that on this 29th day of July, A. D., 1901, before me in chambers, Channing, Hartley County, Texas, came John V. Farwell and Charles B. Farwell, who appeared by attorneys solely for the purpose of giving notice of appeal herein, and appealing from the interlocutory order appointing receivers heretofore made by me, and for no other purpose, and who expressly reserve all rights they have heretofore had to object to personal apparance and service, waiving none of them, and then and there excepted to the interlocutory order herein mentioned appointing receivers herein, and then and there gave notice of appeal from the interlocutory order named and entered herein by me in chambers on July 23, 1901, appointing receivers in the above styled and numbered cause, to the Court of Civil Appeals for the Second Supreme Judicial District of Texas, at Fort Worth, Texas, which said notice of appeal is here now entered of record. The clerk of the District Court of Hartley County, Texas, is hereby directed to fix the amount of the supersedeas bond to be given. H. H. Wallace, District Judge, 47th Dist., Tex.

"In pursuance of the above order and direction of the court, and the court having indicated that, in his opinion, $25,000 is a proper sum for

the supersedeas bond in the case, and the counsel for the plaintiffs and the counsel for the receivers having agreed that such sum was sufficient, and counsel for the plaintiffs having stated in the presence of the court and in my presence that he would not object to the amount of the bond fixed at such sum, I hereby fix the amount of the supersedeas bond to be given herein at the sum of $25,000.

"This the 29th day of July A. D., 1901.   Ben Lawson, District Clerk, Hartley County, Texas.    Indorsements:   Filed this 29th day of July, 1901.   Ben Lawson, Dist. Clerk."

The Farwells filed their supersedeas appeal bond in the sum of $25,-000, and have appealed to this court, asking a reversal of the order of the district judge, and for judgment vacating the order appointing the receivers.

A motion was made in his court to dismiss this appeal because it was taken before the order was entered in the minutes of the District Court, and because it was an order made in chambers, and not in open court, and because no notice of appeal was given in open court.

Article 1465, Revised Statutes, provides: "Receivers may be appointed by any judge of a court of competent jurisdiction in this State, in the following cases:" Then follow the cases in which the judge may make such appointments.

Article 1383 provides: "An appeal or writ of error may be taken to the courts of civil appeals from every final judgment of the district court in civil cases, and from every final judgment in the county court in civil cases of which the county court has original jurisdiction, and from every final judgment of the county court in civil cases of which the county court has appellate jurisdiction, where the judgment or amount in controversy exceeds one hundred dollars, exclusive of interest and costs, and an appeal shall lie from an interlocutory order of the district court appointing a receiver or trustee in any cause: provided said appeal be taken within twenty days from the entry of said order; an appeal under such cases shall take precedence in the appellate court, but the proceedings in other respects in the court below shall not be stayed during the pendency of the appeal, unless otherwise ordered by the appellate court."

Article 1387 provides how an appeal may be perfected in cases where final judgment in the cause is rendered, that is, by notice of appeal given in open court, but that article does not apply to interlocutory orders, unless made in open court.

We think the appeal was properly taken when the order appointing the receivers was filed with the clerk, notwithstanding it may not have been entered on the minutes of the court. No notice of appeal in open court or elsewhere is required to be given in such cases; that provision only applies in cases where final judgments are rendered, and where motions for new trials are overruled, and where the interlocutory order is made in open court, and does not, and can not, apply to interlocutory

orders of this character, made upon ex parte hearings, when the court is not in session.

Under the third assignment of error, which asserts that the court erred in appointing receivers, the appellants' counsel in a very able and exhaustive brief have laid down ten propositions, and have supported each with statements, authorities, and argument. This has been so orderly and well done, and in such clear, exact, and concise language, that the writer finds it almost impossible to express the views of the court without infringing upon and often copying therefrom. He thinks that no lawyer ought to complain of an appellate judge for copying his brief as law in the court's opinion, if the decision is in his favor.

The first proposition of appellants is, in substance, that the right to the appointment of a receiver of a corporation is not a cause of action, but only an ancillary right to a cause of action, and a preliminary protective measure by which property is impounded and held by the court until the cause of action alleged is judicially determined. If there is no cause of action alleged, then no right exists to have a receiver appointed.

This proposition is correct, and is supported by the following authorities: Land and Cattle Co. v. Bindle, 5 Texas Civ. App., 21, 23 S. W. Rep., 819; Investment Co. v. Crawford, 45 S. W. Rep., 738; Iron Co. v. Blevins, 12 Texas Civ. App., 410. But we understand that the petition in this case seeks to set aside alleged fraudulent contracts or leases procured by the syndicate from the company by fraudulent means; and for an accounting of the lessees to the company, and for a restoration of its property, and for a winding up of the corporation and distribution of its assets, and if the allegations are sufficient to entitle the plaintiffs to this relief, or can be made so by amendment, and it is made to appear that a receiver ought to be appointed, then the suit is well brought. It is alleged here that the "corporation is in imminent danger of insolvency," which is a statutory ground for the appointment of a receiver, if the plaintiffs show themselves entitled to such relief. Rev. Stats., art. 1465, sec. 3. But the question still remains whether the allegations of the petition show the plaintiffs entitled to the appointment of a receiver. We have sufficiently stated the substance of the petition to show the strength of the plaintiffs' case, and we are of opinion that the petition does not show that the plaintiffs are entitled to the relief granted by the learned district judge, because it fails to show that the contracts complained of are void or invalid. The facts stated show only that the contracts and leases might have been avoided by the corporation, or by a stockholder who has not ratified the fraudulent contracts by acquiescence or otherwise.

Counsel for appellee contend that the petition shows the contracts to be void, but we think not. As a general rule contracts made by a corporation with a minority of its directors are not for that reason void; they are only voidable.

Counsel for appellants have presented in a very forcible manner some very high authorities in support of the proposition that such contracts are not void. Mr. Morawetz states the rule with reference to contracts between a corporation and minority directors, as follows: "The incapacity of the agents of a corporation to bind it by making contracts with themselves personally, rests solely on the principles of the law of agency. There is no arbitrary rule of law prohibiting contracts between a corporation and its agents, where these principles have no application. Thus, if an agent does not assume to represent the corporation in entering into a contract with it, but deals with another independent agent, who has authority to act for it, the transactions will be unobjectionable. An agent may even represent the corporation in executing a contract with himself personally, provided he acts under immediate instructions from some other superior agent, or from the board of directors. * * * There is no necessary impropriety in a contract between a director and the corporation, if the latter is represented by other agents. On the contrary, such contracts are, in many instances, the natural result of circumstances, and are justified by the approved usages of business men. The directors of a corporation are generally selected by reason of their influence or wealth, and because they are interested in the success of the company and familiar with its affairs. Not infrequently, persons who agree to advance money to the corporation expressly stipulate for a voice in the board of directors, so that they may be able to supervise the faithful application of the money advanced, and keep watch for their own security. To prohibit the directors, in all things, from dealing with the corporation, would often deprive the latter, in time of need, of the assistance of those persons who have the greatest interest in its welfare and who are willing to give their aid upon the most reasonable terms." 1 Mora. on Priv. Corp., sec. 527. To the same effect is Railway v. Carson, 151 Illinois, 444.

In an extended opinion by Mr. Justice Harlan, concurred in by Judge Blodgett, which involved this proposition, the rule was thus stated: "A contract in the name of a corporation by its board of directors is not void, if otherwise unassailable, because some of the directors, constituting a minority, used their position with the effect, or even for the purpose, of advancing their personal interests, to the injury of the company they assume to represent." Jessup v. Railway, 43 Fed. Rep., 483. That such a lease, even when assailable, is not void, is decided in Seymour v. Association, 144 N. Y., 333, 26 Law. Rep. Ann., 859; Railway v. Pacific Beach Co., 112 Cal., 53, 33 Law. Rep. Ann., 788.

In Electric Belt Line v. Ide, 15 Texas Civil Appeals, 273, the court cites with approval the rule stated in 3 Thompson on Corporations, sections 4068, 4071, that directors may deal with the corporation, take securities in their own favor and enforce them, like other creditors, subject to scrutiny of the transaction, and under the obligation of acting in the utmost good faith. This decision recognizes that such con-

tracts are not void, or fraudulent per se, but are only voidable, and then only when the surrounding circumstances show that they ought not to be enforced.

- It being thus established that a contract, made with a minority of the board, is not void, but at most voidable, what are the rules by which the court will determine the question of its fairness and validity, when a suit is properly brought to set it aside? The court never substitutes its judgment, on questions of policy, for that of the governing body of the corporation, and does not seek to decide business questions, nor to set aside the acts of the majority, because the court may think that another course would have been wiser, or even that the course adopted was plainly unwise. The course of conduct by the directors must have been such as to plainly show an intention to sacrifice the interest of the corporation and the minority stockholders.

Our Supreme Court has used the following language on this subject: "The breach of duty authorizing a suit by an individual stockholder for damages in the depreciation of his stock, does not refer to mere mismanagement or neglect of the officers or directors in the control of the corporate affairs, or the abuse of discretion lodged in them in the conduct of the company's business. On this ground the courts do not interfere. The breach of duty or conduct of officers and directors which would authorize in a proper case the court's interference in suits of this character, is that which is characterized by ultra vires, fraudulent, and injurious practices, abuse of power and oppression on the part of the company or its controlling agencies, clearly subversive of the rights of the minority or of a shareholder, and which, without such interference, would leave the latter remediless. Thomp. on Lia. of Off., 391; Pom. Eq. Jur., sec. 1096. But if the acts or things are or may be that which the majority have a right to do, or if they have been done irregularly, negligently, or imprudently, or are within the exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved, these would not constitute such breach of duty, however unwise or inexpedient such acts might be, as would authorize the interference by the courts at the suit of a stockholder." Cates v. Sparkman, 73 Texas, 619.

The rule is thus stated by the Court of Appeals of New York, in the case of Gamble v. Water Co., 123 New York, 91, 9 Lawyer's Reports Annotated, 527, the opinion being written by Judge Peckham. The court, after there showing that contracts made with directors are never void, but only voidable, takes up the question of the case which must be made to warrant the court in interfering at the instance of the stockholder, and says: "The court would not be justified in interfering, even in doubtful cases, where the action of the majority might be susceptible of different constructions. To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint stock association, as against the contemplated action of the majority, where such action is within the corporate power, a case must

be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company, and in a manner inconsistent with its interest. Otherwise the court might be called upon to balance probabilities of profitable results to arise from the carrying out of the one or the other of different plans proposed by or on behalf of different shareholders in a corporation, and to decree the adoption of that line of policy which seemed to it to promise the best results, or at least to enjoin the carrying out of the opposite policy. This is no business for any court to follow."

In the case of Wheeler v. Pullman Iron and Steel Company, 143 Illinois, 197, a bill was filed by a minority stockholder to set aside contracts between the corporation and another corporation which was substantially owned by a majority of the directors and stockholders in the company in which the plaintiff was interested. The gist of the complaint was, that this contract was inimical to the interests of the Pullman Iron and Steel Company, and that by it the Pullman Palace Car Company, in which the majority of the directors were interested, secured the entire output of the iron and steel company's product at less than market price, in fraud of the right of the other stockholders; and it was alleged that the control of the iron and steel company, in which the plaintiff was interested, was in the hands of the Pullman Palace Car Company and George M. Pullman, its president, who was also the owner of the majority of the stock in the iron and steel company, and had chosen and elected all of its directors, and that the persons so named were all either officers or employes of the palace car company.

In that case the bill prayed (as in the case at bar) the winding up of the corporation, as well as the setting aside of the contract. The court held that equity had no jurisdiction to wind up a corporation and distribute its assets at the suit of a stockholder, even when it was insolvent, or made insolvent by fraudulent management of its managing officers. Then, taking up this question, it says: "Courts of equity will not undertake to control the policy or business methods of a corporation, although it may be seen that a wiser policy might be adopted and the business more successful if other methods were pursued. * * * Nor can it be said, from the facts alleged, that the interest of the stockholders have suffered more by the course pursued than if a different policy had been adopted. It is not shown by the bill what the product of the company amounted to, or that a market could be found for its output at any price. True, it is alleged that if the sales to the Pullman Car Company had been at the market price, without alleging what either was, the iron company would have realized a much larger profit; but whether it could have been sold upon the market is wholly left to conjecture. It may be, and it often is, undoubtedly more ad-

vantageous to sell the entire output of the business, even at a small profit, rather than depend upon an uncertain general market."

In that case it was alleged that the interests of the minority stockholders were being sacrificed for the personal benefit of the majority; that the company could be run at a profit, but for the conduct of the majority and the fraudulent contract which they had made. The allegations in this respect are quite similar to the charge in the petition here, that the Capitol Company would make great profits if its property were taken away from the syndicate, and these contracts set aside, and that it would have made such profits in the past. The court said upon this point: "It may well be questioned, considering the financial condition of the company at the time, whether the policy of supplying a single customer, and obtaining a line of credit thereby which enabled it to operate its work, was not dictated by the soundest business discretion."

Appellant's counsel also contend that "a stockholder can not maintain a bill to set aside contracts made by the corporation before he became a stockholder." The facts stated in the petition upon which this proposition is predicated, are, that the plaintiff Mrs. Babcock holds her stock by virtue of her husband's will, and by recent transfer from William H. Parlin, in whose name the stock has always stood on the books of the company. The date of the transfer from Parlin is not stated in the petition, but as it appeare therefrom that Babcock was alive on December 8, 1897, it must have been after that date. The latest contract which the petition seeks to have set aside is dated July 12, 1894, and had therefore been in existence more than three years before either plaintiff was interested in the corporation. In that period, upon the allegations of the petition as to the amount of annual expenses and interest, the syndicate, under the contract of guaranty, must have paid out $400,000 per year, a total of $1,200,000, aside from purchases of cattle and improvements. So far as the petition shows, all of those who owned stock at the time the contracts were made, consented to or acquiesced in the contract.

The general rule is that a stockholder can not attack contracts executed, and rights secured under them, before he became interested in the corporation, and this rule is the logical result of the relation which he bears to the corporation, and of the theory upon which he is allowed, in any case, to question its action. When one buys stock in a corporation he most generally takes its affairs as he finds them, and does not always acquire the right to overturn what has been done, whether it meets his approval or not. Nothing that occurred before he became a stockholder injured *him* in any way. He may in some cases interfere with transactions which are in fieri and not yet completed so as to create vested rights, because the completion of them will affect him; but he can not disregard the rights of persons whose transactions did not injure him, and received the approval, either expressly or by ac-

quiescence, of those whose interests were affected, and who thus exercised the right to approve or disapprove.

In applying this principle the United States Supreme Court said:: "The two [complaining stockholders] claimed to be the owners of 1500 shares of stock of the company. The whole number of shares is 240,- 000. The owners of the balance of this large number make no complaint of the transactions which the complainants seek to annul, and it does not appear that the complainants owned their shares when these transactions took place. For aught we can see to the contrary, they may have purchased the shares long afterwards, expressly to annoy and vex the company, in the hope that they might thereby extort from its fears. a larger benefit than the other stockholders have received or may reasonably expect from the purchase, or compel the company to buy their shares at prices above the market value. Unfortunately, litigation against large companies is often instituted by individual stockholders from no higher motive. Dimpfell v. Railway, 110 U. S., 202. To the: same effect is Hawes v. Oakland, 104 U. S., 450.

In United Electric Securities Company v. Electric Light Company, 68 Federal Reporter, 673, Judge Pardee said: "As a general proposition,. the purchaser of stock in a corporation is not allowed to attack the acts and management of the corporation prior to the acquisition of his stock; otherwise we might have a case where stock duly represented in a corporation consented to and participated in bad. management and waste, and after reaping the benefit of such transactions could be easily passed into the hands of a subsequent purchaser,. who could make his harvest by appearing and contesting the very acts. and conduct which his vendor had consented to." In Alexander v. Searcy, 81 Georgia, 536, the court said: "The weight of authority seems to be that a person who did not own stock at the time of the transactions complained of, can not complain or bring a suit to have them declared illegal."

The rule was applied by the Supreme Court of Iowa in Clark v. American Coal Company, 86 Iowa, 436, where the court holds that the purchaser of stock has no greater equity than his grantor, and comments on the fact that he was in a position to see the corporation's situation when he purchased. "In proceedings by stockholders to enforce their rights as against the corporation, or the rights of the corporation as against third parties, it should be set forth by proper allegations that the complainants were stockholders at the time of the transaction of which they complain, and that they are still so." 20 Enc. of Pl. and Prac., 777.

In a suit brought to attack an agreement by which two of the only three stockholders of a corporation had bought the stock of the third, and agreed that it should be paid for out of the earnings of the company, it was held that those who inherited their stock from one of the parties to the agreement could not attack it; nor could a party attack it who became an owner of the stock after the money had been paid by

the corporation. And the court expressly held that the dividends which were thus used to pay the debt of the directors belonged to those who then owned the stock, and therefore a subsequent owner of the stock could not complain. Brewing Co. v. Schneider, 110 Mo., 83, 19 S. W. Rep., 67.

But the view we take of this case does not require us to decide whether these contracts made with the syndicate, the three minority directors, were ratified by acquiescence on the part of the owners of the plaintiffs' stock or not; nor do we want to be understood as holding that in no case can a stockholder maintain an action against the officers, directors, or majority stockholders to set aside fraudulent contracts and dealings with the company, or its board of directors, unless the party suing owned the stock at the time the fraudulent transactions complained of were committed. We find it unnecessary to decide these questions, because it is expressly admitted in the petition that, on the 30th day of January, 1896, Amos C. Babcock, being then involved in litigation with the two Farwells and Abner Taylor in the courts of Illinois, in which was involved a controversy over the amount of his interest in the capital stock of the Capitol Company, entered into a compromise agreement in settlement of said litigation wherein the said Farwells and Taylor, in consideration of the settlement, gave him the stock now held by the plaintiff, and a certain amount of money, the amount not named in the petition, and in which compromise agreement a clause was inserted to the effect that the said Amos C. Babcock ratified and confirmed all the contracts and leases which had been made with and to the said Farwells and Taylor. The able counsel of appellees, in preparing the petition, saw and felt the necessity of avoiding the fatal legal effect of this clause of ratification, and followed it with these allegations: "That on or about the 30th day of January, 1896, while the said Amos C. Babcock was wholly unable physically and mentally to transact any business whatever, the members of said syndicate conceived a plan of settlement of said litigation with him;" but that allegation is immediately followed by the further statement: "And the said Babcock, realizing and knowing that in all reasonable probability he would not live until the termination of said litigation, entered into a certain agreement in writing between himself and the members of the said syndicate by which certain stock was alloted to him in compromise of said differences, and certain money was paid to him. That the members of said syndicate caused the contract affecting said settlement to be prepared, and inserted therein, without the knowledge and consent of said Babcock, a clause by which he purported to ratify and confirm the acts of the defendant company in the making of the several pretended leases hereinbefore complained of. That said pretended contract of settlement, in so far as the same ratified, by the said Babcock, the wrongful acts of the defendant company in the entering into and making of said contracts, is fraudulent and void, and should be set aside and not enforced. That at the time of the execution of said

pretended contract of compromise the said Amos C. Babcock did not know of the existence of said last pretended lease contract of July 12, 1894." This is all that is alleged in avoidance of the ratifying clause in the compromise agreement, and presumptively all that the plaintiffs could say, truthfully, and is wholly insufficient to avoid the legal effect of the ratifying clause.

It is not alleged that Babock did not read it before signing it, nor that the members of the syndicate did anything to conceal the contents of the agreement from Babcock. He must be held to a knowledge of the contents of the instrument he has signed, unless it is shown that the adverse party practiced some fraud, misrepresentation, or deceit whereby he was misled or misinformed as to its contents, and was thus induced to sign it in ignorance of its contents. The petition contains no such allegations, nor anything like them.

These views result in the reversal of the order of the district judge appointing receivers, and, as it is our duty to do, we here render judgment vacating said order and discharging said receivers.

*Receivers discharged.*