HOME FIRE INSURANCE COMPANY, APPELLANT AND APPEL-
LEE, V. CHARLES J. BARBER, APPELLEE AND APPELLANT.

FILED FEBRUARY 17, 1903. No. 12,158.

Commissioner's opinion, Department No. 2.

1. **Corporation:** SUBSEQUENT STOCKHOLDERS: PRIOR MANAGEMENT.
Subsequent stockholders have no standing, as a general rule,
to attack prior mismanagement of the corporation.

2. **Such Stockholder's Right to Sue.** Such a stockholder ought not to
be allowed to sue unless the mismanagement or its effects con-
tinue and are injurious to him, or it affects him specially and
peculiarly in some other manner.

3. **Stockholders:** WRONG-DOERS: ACQUIRING OF STOCK: STANDING TO
COMPLAIN. Stockholders who have acquired their shares and
their interest in the corporation from the alleged wrong-doers
and through the prior mismanagement, have no standing to
complain thereof.

4. **Stockholder's Title to Corporate Property:** CORPORATION MUST ACT
THROUGH PROPER AGENTS. Stockholders, as such, have no title
to the corporate property which they may convey or incumber
in their own name; but this is only another way of saying that
the corporation must act through its proper agents, and in the
prescribed way.

5. **Corporation:** STOCKHOLDERS: SEPARATE AND DISTINCT PERSONS.
Where a corporation is proceeding at law, or where it is assert-
ing a title to property, or the title to property is involved, the
corporation is regarded as a person separate and distinct from
its stockholders, or any or all of them.

6. **Corporation:** STOCKHOLDERS: SUBSTANTIAL BENEFICIARIES: STAND-
ING IN EQUITY: RIGHT TO RECOVER. But where it is proceeding
in equity to assert rights of an equitable nature, or is seeking
relief upon rules or principles of equity, the court of equity will
not forget that the stockholders are the real and substantial
beneficiaries of a recovery; and if the stockholders have no
standing in equity, and are not equitably entitled to the remedy
sought to be enforced by the corporation in their behalf and for
their advantage, the corporation will not be permitted to
recover.

7. **Overruled.** The proposition announced in the fourth paragraph of
the syllabus in *Fitzgerald v. Fitzgerald & Mallory Construction Co.*,
41 Nebr., 374, was in effect, if not expressly, retracted on rehear-
ing in *Fitzgerald v. Fitzgerald & Mallory Construction Co.*, 44 Nebr.,
463, and is disapproved.

Syllabus by court; catch-words by editor.

8. **Basis of Recovery.** A plaintiff must recover on the strength of his own case, not on the weakness of the defendant's case; it is his right, not the defendant's wrong-doing, that is the basis of recovery.

9. **Contract of Employment: SERVICE: FIXED PERIOD: AFTER CONTINUANCE: PRESUMPTION.** Where service under a contract of employment for a fixed period continues after such period has expired, it is presumed to be under the same contract; but this presumption must yield to evidence showing a change of terms.

10. **Corporation: GENERAL MANAGER: SALARY: CONTRACT: EXPIRATION: CONTINUANCE OF EMPLOYMENT WITHOUT NEW AGREEMENT: VOLUNTARY REDUCTION: JUDGMENT FOR BACK SALARY.** The general manager of a corporation, after expiration of a contract fixing his salary at $5,000 *per annum*, continued in the same employment, without any new agreement, and afterwards voluntarily reduced his salary to $3,000 *per annum*, drawing it from month to month thereafter on that basis for many years, until he gave up the office. After the original contract, no action was taken by the directors with reference to his salary; but the evidence that he took the less sum from time to time in full payment was clear and convincing. *Held,* That a judgment for back salary at the rate of $2,000 *per annum* could not be sustained.

APPEAL from the district court for Douglas county. There is a better statement of the case in the opinion than the editor feels able to make. Heard below before KEYSOR, J. *Reversed.*

*Byron G. Burbank* and *Halleck F. Rose,* for the Home Fire Insurance Company.

*Westel W. Morsman* and *Virgil O. Strickler, contra.*

POUND, C.

The plaintiff is an insurance company, organized in 1884, with a capital stock of $100,000, divided into 1,000 shares of $100 each. Its business is conducted by a board of directors, a finance committee, an executive committee and certain other officers, including a secretary and general manager. It appears that the secretary and general manager, at least down to December, 1899, was at all times intrusted with the active management and control

of the company's affairs, and the president and the remaining officers appear to have given very little, if any, attention thereto. The appellant and principal defendant, Charles J. Barber, was one of the original incorporators of the company and was a stockholder therein from its organization until December 2, 1899. During that period, he was secretary and general manager, one of the directors, and a member of the executive committee. His codefendants, Lovett, Woodman and Reynolds, were also original incorporators and stockholders, and from time to time from its organization until December 2, 1899, were directors and members of the executive and finance committees. On December, 1899, the defendant Barber entered into a contract with one Funkhouser, whereby he agreed to sell to said Funkhouser all of the shares of the capital stock of said company, except two shares, which he was to obtain if possible, and to procure the resignation of all the officers and a majority of the directors. He also agreed not to engage in the insurance business directly or indirectly, for a period of three years. By the terms of the contract he was to furnish to Funkhouser a true and complete statement of all the assets and liabilities of the company, and if upon investigation the statement of assets and liabilities proved to be correct and satisfactory to Funkhouser, the latter was to pay the sum of $75,000 for said shares, less $200 for the two shares above mentioned, in case they could not be obtained, and a further sum of $40,000 as a bonus for obtaining all of the shares of stock and for procuring the resignation of the officers, relinquishing his control of the company, and agreeing not to engage further in the business of insurance. On December 2, 1899, pursuant to said contract, the defendant Barber delivered to said Funkhouser all of the shares of the capital stock of said company except eight. He also delivered an option contract for six of the remaining shares, and subsequently procured and delivered the other two. In payment therefor he received the sum of $94,380.60 in cash and $20,619.40 in assets

of the company—namely, $12,350 of collateral loans, which he had agreed to accept at the time when the contract of sale was made, and certain other assets amounting to $8,269.40, which Funkhouser had refused to accept at the time when the list of assets was under consideration. Accordingly the shares of stock were transferred on the books of the company, under the direction of Funkhouser, to himself and certain others, his associates in the transaction, and he and his said associates became thereupon and now are the only stockholders in the company. None of them had held stock therein theretofore. At the same time, pursuant to the contract, the defendant Barber resigned his office and procured the resignation of the defendants Reynolds, Woodman and Lovett and of the other principal officers and directors of the company, and a new board of directors was elected and new officers took charge. On November 20, 1899, evidently in contemplation of a transfer of all his interest in the corporation, the defendant Barber drew out $2,200 of the company's money upon a claim of unpaid salary. Subsequent to the change in management of the company, this was discovered, and a controversy arose between Barber and the new management with reference thereto, as a result of which suit was brought by the company to recover said sum. Thereupon Barber made a counter-claim for some $10,000 of salary alleged to be due him and not withdrawn, and as a result of examination and investigation of the company's books with reference to this claim, certain irregularities and mismanagement came to light, which were set forth in an amended petition and furnished the principal points of controversy in the case as finally tried.

Thus there are two branches to the case: Upon the one hand a suit by the corporation to recover the money taken out by Barber as back-salary just prior to the time he sold his stock, and certain other money which at various times he is alleged to have appropriated wrongfully to his own use, and on the other hand a suit to recover for Barber's mismanagement and for profits made by him

through the use of the company's money at a time when
he stood in a fiduciary relation thereto. The principal
mismanagement consisted in borrowing funds of the com-
pany to purchase its stock and in making a profit out
of the purchase of the stock and the dividends accruing
thereon. At the time the stock was bought with money
borrowed from the company it was worth about $55, a
share. But seven years later, when the defendant Barber
sold out his interest in the company, it had come to be
worth $115 a share. During that time dividends had
accrued in considerable amounts, and had been paid to
and received by Barber. The decree compels Barber to
account for the profits and for the dividends, on the ground
that the loan of the company's funds and the use of those
funds in purchase of the stock was unauthorized, and
that the profits and the dividends belonged in equity to
the company. Upon the issue as to salary, the court found
that Barber was entitled to recover for back-salary, as
claimed, and applied the amount found to be due him
thereon upon the amounts found due the company by rea-
son of his mismanagement.

The facts with reference to the mismanagement, as
found by the court, are substantially these: In January,
1892, and for some time prior to that date, the stockholders
of the company were divided into two factions. The one
consisted of the defendants Barber, Lovett, Reynolds and
Woodman, who held 237 shares, and some other stock-
holders, not sufficient, however, to constitute a majority.
The other faction was controlled by one Hamilton, and
held in the aggregate 507 shares. As the controversy be-
came acute, the Hamilton faction required the Barber
faction to purchase their 507 shares of stock, or else to
submit to the election of a board of directors who would
choose a new secretary and general manager and entirely
alter the policy and management of the company. It
appears that Barber and his associates were experienced
insurance men, while Hamilton and his faction were not,
and the court has found that Barber, Lovett, Woodman

and Reynolds believed it to be for the best interests of the company, as well as for their own interest, that the company should be managed by persons of experience in the business. Accordingly, they agreed among themselves to purchase the 507 shares and thus preserve control of the company. For that purpose they agreed also to procure money temporarily by borrowing of banks on their own notes, paying said notes with money which they could borrow from the company as soon as they could obtain control thereof, unless in the meantime they were able to sell enough of the shares purchased to pay off their notes, or to pay them off by the sale of other property. In pursuance of this design, they borrowed the necessary funds of banks, purchased the shares, and distributed them among themselves, the majority going to the defendant Barber. A period of financial depression was imminent, and after the purchase it became impossible to dispose of the shares, as the defendants had hoped, so that it was necessary to borrow of the company in order to pay off their notes at the banks. Accordingly the defendants resorted to the company's funds, borrowing a portion upon real estate security and another portion upon notes secured by pledge of the stock. As to the money borrowed upon real estate security, the court has found that the loans were made in good faith, with bona-fide intention of repaying them in full, principal and interest; that the security was fair and reasonable; that the loans were made according to the usual mode of business of the company; were entered upon the books in the regular way; were known to the officers, directors and stockholders of the company; were in large part included in the annual reports of the company, and have all been paid in full, either by cash or conveyances of property to the company, except the interest on a mortgage loan to the defendant Barber. The loans on collateral security, on the contrary, were not carried on the books of the company openly in the name of the parties who obtained them. They were not such loans as the statute authorized the

company to make, and the court has found that they were not properly secured. The court has also found that it was agreed between the defendants Barber, Lovett and Reynolds, when these collateral loans were originally obtained from the company, that they would pay no interest thereon, and that after a short time they ceased to pay any. These loans were kept standing on the books, in one form or another, until the sale of the stock of Funkhouser in December, 1899, when the collateral loan account, which consisted of these items, was turned over to Barber, as before stated. The court found on this point that the apportionment of the consideration which Funkhouser was to pay and did pay to Barber for all the shares of stock in the company, as provided for in the contract, whereby $75,000 was stated to be the consideration for the shares of stock, and the remaining $40,000 a bonus, was made after the sale was practically consummated, to enable Barber to buy in the shares of the company held by other stockholders for the purpose of selling and delivering them, and that the real value of the stock and the true consideration received therefor was not $75,000, but the full sum of $115,000. Upon this basis the court found that the portion of said 507 shares of stock which was covered by the collateral loans, namely, 203 1-6 shares, was at all times, after the sale by Hamilton, in equity the property of the company, and that the company was entitled to recover the full consideration which Funkhouser paid Barber therefor, namely, $115 a share.

Another item of mismanagement grew out of a mortgage loan to the defendant Woodman. In 1886, Woodman and his wife borrowed $1,400 of the plaintiff upon a mortgage. In January, 1898, there were $1,600 due upon the loan, and on that date Woodman assigned to Barber his half interest in 75 shares of the stock purchased from Hamilton and his associates, which had been apportioned to Lovett and Woodman as partners. Thereupon the company released the mortgage, and Barber charged the $1,600 on the books of the company as cash. This item was

carried on the books in various ways until December 1, 1899, when Barber paid it. The court considered that this amounted to a use of $1,600 of the company's funds in the purchase of the stock, and that the profits on 37½ shares, amounting to $2,612.50, should be accounted for to the company.

A similar item grows out of the purchase by Barber from the plaintiff of 20 shares of stock, originally held by the wife of the defendant Reynolds. This stock was sold to the company on August 1, 1899, and applied on a mortgage of $2,700, given by her and her husband to the company. The court found that Barber purchased the stock of the company, giving his note for a portion, and carrying the remainder upon the books of the company by various devices until December 1, 1899, when the whole was paid. It held, therefore, that he was liable to the company for the profit on these shares.

A further item of mismanagement grows out of a mortgage for $2,600 executed by one Raff. In January, 1894, an instalment of principal and a large amount of accrued interest and taxes had fallen due. At that time the mortgage was assigned by its then holder to the defendant Barber for about the sum of $1,300. The court has found that Barber knew at the time that foreclosure would be necessary, and immediately instituted a suit in his own name for that purpose. Pending a stay on order of sale pursuant to decree in the foreclosure suit, Barber assigned the mortgage to the plaintiff company as collateral security for a note which he owed it, and afterwards drew out $2,500 of the company's money in payment therefor. Subsequently, the foreclosure sale was confirmed and a large deficiency judgment entered. This judgment was never assigned to the company; but after receiving a master's deed in the foreclosure proceedings, he conveyed the property by warranty deed to the plaintiff. The court found that the company paid taxes amounting to nearly $1,200, and, taking this into account, held that the total amount of the company's money used in the transaction

was over $5,100. It found further that this was an improvident and unlawful investment, in case the mortgage was bought originally for the company, as Barber alleged; and that if it was not so bought originally, the sale to the company pending stay in the foreclosure suit was a violation of his trust, so that in either event he did not act for the best interests of the company, and upon reconveyance should account to it for said sum of $5,100.

The other items are of a different nature. In 1895 Barber, while secretary and manager of the company, drew two checks for $1,500 each—one to the defendant Reynolds and the other to the defendant Lovett. These checks were indorsed, and deposited by Barber in his personal account. Thereupon he drew his check in favor of the company for the aggregate sum, deposited it to the credit of the company, and credited said sum of $3,000 on collateral notes signed by himself and said defendants, as a payment thereon. These checks were issued in payment of alleged claims for services rendered by Lovett and Reynolds in preventing legislation hostile to the company and other similar matters, and the court has found that such claims were not bona-fide and were barred by the statute of limitations, and that the transaction was in effect a conversion of $3,000 of the company's money. It has also found that at various times the defendant collected sums amounting to $237.37, belonging to the company, for which he failed to account. We think that the item of interest on the mortgage loan above mentioned is to be put in the same category. And here belongs also the claim for $2,200 of the company's funds withdrawn by Barber on November 20, 1899, on account of back-salary. Upon the issues as to salary, the court found that in 1890 a contract was entered into between Barber and the company, whereby he was to receive a certain salary for the remainder of that year and for the year 1891, and from January 1, 1892, to January 16, 1895, a salary at the rate of $5,000 per annum. The term of employment under the contract was for five years. Barber served, however, continuously from

the inception of the contract until December 2, 1899, and after the expiration of the term provided, no action of any kind was ever taken by the company, by its board of directors or by any committee or officer, other than Barber, with reference to the amount of salary. But in 1895, on account of general financial depression, it became necessary to reduce the salaries of all employees, and at that time Barber voluntarily reduced his own salary to $3,000 *per annum*. The court finds that from that date he drew his salary from month to month substantially on the basis of such reduction until he terminated his connection with the company. The evidence tends to show that during the period from 1895 to 1899 he made repeated admissions that his salary was paid, that he made statements of the condition of the company from which it is evident he considered his salary was $3,000 a year, and that the statement of the assets and liabilities which he made to Funkhouser, pursuant to his contract, was made upon the same basis. The court found, however, that he was not estopped by his voluntary action, but was entitled to receive salary at the rate of $5,000 a year during the whole period from 1895, and that there was due him on account of undrawn salary the sum of $9,485.22.

Thus, as already indicated, this suit involves two distinct questions. The liability of the defendant Barber to account to the company, as at present constituted, for his mismanagement and unauthorized dealings with the company's funds prior to the sale of all the stock to Funkhouser and his associates is one question. His liability to the company for money and assets of the company withdrawn and converted to his own use is quite another question. Connected with this last question is his claim for unpaid salary.

We shall first address ourselves to the question of Barber's liability for mismanagement. Complaint is made of the findings of fact of the trial judge upon the several items with respect to which mismanagement is charged. The evidence on these points is very voluminous, and in

some respects is conflicting. Much of it takes the form of expert testimony with reference to the company's books, and is made up of conclusions deduced by accountants from their examinations of the books and papers of the company, which are difficult to follow, and at times are somewhat conjectural. But upon review of the evidence, we are satisfied that the findings of fact are accurate and complete, and are well sustained by competent and credible evidence. We have no disposition to interfere with any of them. Accepting these findings of fact, however, several important questions of law arise with reference to which the decree rendered must be tested.

Counsel for the appellant makes three points. The first is that the several transactions recited amounted to loans of the company's money to Barber, and that, as the money borrowed has been repaid, he and not the company is entitled to the profits. We can not assent to this proposition. The use of the company's money amounted, as the court has found, to a speculation by one of the officers in violation of his trust, which resulted in a profit. Were this an ordinary case, we think there can be no question that the corporation would be entitled to sue, or a stockholder on its behalf and for the benefit of all others. But it is urged that this is not an ordinary case. None of the present stockholders were owners of stock in the corporation at any time previous to December 2, 1899. All of them acquired their interest in the corporation by and through the sale from Barber to Funkhouser on that date. Accordingly, the second point made by counsel is that as the defendant Barber came to own all of the stock, and the present stockholders acquired their stock through him, there was a merger in said defendant of all the claims which the corporation or its stockholders might have held against him, and such claims became extinguished thereby. We do not think this point is well taken. The trial court has found, upon conflicting evidence, that the defendant was never the owner of all the stock in the corporation, but was only the agent of some of those whose stock he

procured and sold to the present stockholders. There is ample evidence to show that this is true, and that as to several shares of stock he had at no time any beneficial interest. The third and most serious point is that a recovery in the present case would be entirely for the advantage and inure to the benefit of the present stockholders. It would amount in substance to a recovery back by them of the purchase-money which they paid the defendant Barber for his stock, since the money, when recovered for the corporation, would be for distribution among them—the sole stockholders of the company as now constituted.

This raises numerous and difficult questions. It must be determined whether the present stockholders or any of them are entitled to complain of the acts of the defendant and of his past management of the company; for if any of them are so entitled, there can be no doubt of the right and duty of the corporation to maintain this suit. It would be maintainable in such a case even though the wrong-doers continued to be stockholders and would share in the proceeds. 1 Morawetz, Private Corporations, sec. 294. We have therefore to consider first, how far, if at all, subsequent shareholders may complain of prior mismanagement of the corporation. Next we must consider how far subsequent shareholders may complain of mismanagement when they hold through such mismanagement or have acquired their shares from persons who participated therein. The third question to be considered is whether the result of a recovery in this case would be inequitable, as permitting the present stockholders to recover back purchase-money, or a portion thereof, for which they received full consideration, and to acquire shares worth $115 each at $55 a share, and in addition thereto, recover and divide among themselves a further sum of $60 a share, imposed upon the defendant Barber for his delinquencies in matters which have in no way injured the present stockholders, or any of them, or their interests. Finally, assuming that by reason of the foregoing propo-

sitions the present stockholders are in no position to complain and have no standing in equity, may the court look beyond the corporation to the ultimate and substantial beneficiaries of a recovery, or is it bound to deal with the corporation as a separate person in all respects?

Sound reason and good authority sustain the rule that a purchaser of stock can not complain of the prior acts and management of the corporation. *Hawes v. Contra Costa Water-works Co.*, 104 U. S., 450, 26 L. Ed., 827; *Dimpfell v. Ohio & M. R. Co.*, 110 U. S., 209, 3 Sup. Ct. Rep., 573, 28 L. Ed., 121; *Taylor v. Holmes*, 127 U. S., 489, 8 Sup. Ct. Rep., 1192, 32 L. Ed., 179; *Southwest Natural Gas Co. v. Fayette Fuel-Gas. Co.*, 145 Pa. St., 13, 23 Atl. Rep., 224; *Alexander v. Searcy*, 81 Ga., 536, 8 S. E. Rep: 630, 12 Am. St. Rep., 337; *Clark v. American Coal Co.*, 86 Ia., 436, 53 N. W. Rep., 291, 17 L. R. A., 557; *United Electric Securities Co. v. Louisiana Electric Light Co.*, 68 Fed. Rep., 673; *Venner v. Atchison, T. & S. F. R. Co.*, 28 Fed. Rep., 581; *Heath v. Erie R. Co.*, 8 Blatchf. [U. S. C. C.], 347, Fed. Cas. No. 6,306; · *Dannmeyer v. Coleman*, 8 Sawy. [U. S. C. C.], 51, 11 Fed. Rep., 97; *Pennsylvania Tack Works v. Sowers*, 2 Walk. [Pa.], 416; 4 Thompson Corporations, sec. 4569. In *Alexander v. Searcy, supra,* the court say (p. 550) : "The weight of authority seems to be that a person who did not own stock at the time of the transactions complained of, can not complain or bring a suit to have them declared illegal." In *United States Securities Co. v. Louisiana Electric Light Co.* it is said (p. 675) : "As a general proposition, the purchaser of stock in a corporation is not allowed to attack the acts and management of the company prior to the acquisition of his stock; otherwise, we might have a case where stock duly represented in a corporation consented to and participated in bad management and waste and, after reaping the benefits from such transactions, could be easily passed into the hands of a subsequent purchaser, who could make his harvest by appearing and contesting the very acts and conduct which his vendor had consented

to." These remarks are not without application to the
case at bar. / The present shareholders are all subsequent
purchasers; they obtained their stock through the defend-
ant Barber; they hold a large number of their shares
under a purchase from him and his associates through the
very mismanagement now complained of; a majority of
the remaining shares come directly from Barber and his
associates in the wrongs upon which this suit is based. In
other words, the present stockholders are contesting acts
through which they get title to a large portion of their
stock, and acts which those through whom they derived
the greater part of the remainder could not have chal-
lenged because they participated therein, and, by contest-
ing these acts, which did not injure any of the present
stockholders in the least, are recovering back a large part
of the purchase price of stock which was admittedly worth
all that they paid for it. Such cases illustrate forcibly
the wisdom of confining complaints of this kind to those
who were stockholders at the time or their successors by
operation of law.

The rule that a suit for mismanagement can not be
maintained by one who was not a stockholder at the time,
has been criticised as based on jurisdictional considera-
tions peculiar to the federal courts and on obsolete com-
mon-law doctrines as to champerty and maintenance. 4
Thompson, Corporations, secs. 4569-4571; 1 Morawetz,
Private Corporations, sec. 270. In our judgment it does
not depend upon either. The federal equity rule, while
designed in part to prevent collusive proceedings in fraud
of the jurisdiction of those courts, goes far beyond the
requirements of such a purpose. If that were the sole
purpose of the rule, it should go no further than to prevent
such suits where the vendor of the stock was a citizen of
the same state as the corporation. If the vendor and pur-
chaser were citizens of the same state, and the vendor, an
original stockholder, had never had the same citizenship
as the corporation, no fraud on the jurisdiction of the
court would be possible, and in such case, if recovery were

proper and the purchaser's cause were meritorious, it would be highly unjust for the court to abrogate its jurisdiction. This consideration alone disposes of the criticism. The rule has its foundation in a sound and wholesome principle of equity,—namely, that the rules worked out by chancellors in furtherance of right and justice shall not be used, because of their technical character, as rules, to reach inequitable or unjust results. Resting on this basis, the "value and importance [of the rule] are constantly manifested." Field, J., in *Dimpfell v. Ohio & M. R. Co.,* 110 U. S., 209, 3 Sup. Ct. Rep., 573, 28 L. Ed., 121. The right of the stockholder to sue exists because of special injury to him for which otherwise he is without redress. If his interest is trifling and the injury thereto of no consequence, he can not sue to compel righting of wrongs to the corporation. *McHenry v. New York, P. & O. R. Co.,* 22 Fed. Rep., 130; *Albers v. Merchants' Exchange of St. Louis,* 45 Mo. App., 206. Hence there is obvious reason for holding that one who held no stock at the time of the mismanagement ought not to be allowed to sue unless the mismanagement or its effects continue and are injurious to him, or it affects him specially and peculiarly in some other manner. *City of Chicago v. Cameron,* 22 Ill. App., 91, 120 Ill., 447, 11 N. E. Rep., 899, is a case of the first type; *Carson v. Iowa City Gaslight Co.,* 80 Ia., 638, 45 N. W. Rep., 1068, is one of the second type. Except in such cases, the purchaser ought to take things as he found them when he voluntarily acquired an interest. If he was defrauded in the purchase, he should sue the vendor. As to the corporation and its managers, so long as he is not injured in what he got when he purchased, and holds exactly what he got and in the condition in which he got it, there is no ground of complaint. *Clark v. American Coal Co.,* 86 Ia., 436, 53 N. W. Rep., 291, 17 L. R. A., 557.

The cases which hold that a subsequent stockholder may sue for mismanagement, may be noticed briefly. Those commonly cited are: *Ramsey v. Gould,* 57 Barb. [N. Y.], 398; *Young v. Drake,* 8 Hun [N. Y.], 61; *Parsons v.*

*Joseph,* 92 Ala., 403, 8 So. Rep., 788; *Winsor v. Bailey,* 55 N. H., 218; *Forrester v. Boston & Montana Consolidated Copper & Silver Mining Co.,* 21 Mont., 544, 55 Pac. Rep., 353.   In *Ramsey v. Gould,* plaintiff, believing that there had been mismanagement, bought shares for the purpose of proceeding against the directors and officers and "bringing them to justice."   The court permitted the suit upon the ground that plaintiff's motives were immaterial. But it is assumed, without discussion, that he had an interest to vindicate, and had suffered some wrong, which is the real question on which such cases depend.   Moreover, it is by no means clear that the motives behind a stockholder's suit are immaterial.   Where stock is acquired for the purpose of bringing suit, it has been held that the complainant is a mere interloper, entitled to no consideration. *Hawes v. Contra Costa Water-works Co.,* 104 U. S., 450, 461, 26 L. Ed., 827; *Moore v. Silver Valley Mining Co.,* 104 N. Car., 534, 10 S. E. Rep., 679; *Kingman v. Rome, W. & O. R. Co.,* 30 Hun [N. Y.], 73; *Du Pont v. Northern P. R. Co.,* 18 Fed. Rep., 467, 471.   And stockholders' suits not brought in good faith in the interests of the corporation have been dismissed on that ground.   *Beshoar v. Chappell,* 6 Colo. App., 323, 40 Pac. Rep., 244; *Belmont v. Erie R. Co.,* 52 Barb. [N. Y.], 637.   In *Young v. Drake,* the court follow *Ramsey v. Gould.*   The further point is made that "the plaintiff acquired all the rights of the person of whom he purchased."   Of course, in a case where those of whom he purchased had participated or acquiesced in the mismanagement, this view would preclude the purchaser from suing.   And he could not sue as being a bona-fide purchaser in ignorance of the disability attaching to his vendor, because shares of stock are not negotiable, and the sale can not pass greater rights than those possessed by the vendor.   *Clark v. American Coal Co.,* 86 Ia., 436, 53 N. W. Rep., 291, 17 L. R. A., 557; 4 Thompson, Corporations, p. 3410.   But it may be doubtful whether a purchaser of stock buys or intends to buy anything beyond the vendor's present interest in the corporation and its

48

assets. His vendor's causes of action for past in-
juries and rights to complain of past mismanagement are
scarcely in contemplation of the parties. We must not
suffer ourselves to be deceived by speaking of causes of
action of the corporation in this connection, since causes
of action of this character belong to the corporation for
the benefit and in the interest of its stockholders. *Par-
sons v. Joseph* and *Winsor v. Bailey* adopt the view of
Mr. Morawetz that the rule announced by the federal
courts is a rule of practice based on jurisdictional peculi-
arities of those courts and not of general application. In
*Forrester v. Mining Co.*, the transaction was not complete
and still required ratification by the stockholders. The
complainants, although they bought after the acts were
done, were stockholders while the matter was still for-
mative, and had an undoubted right to interfere to pre-
vent its consummation. Hence what is said as to the
point in question, is *dictum* only.

The fallacy in the view that one who has not been in-
jured by a transaction and is not affected thereby can
acquire a right to sue in equity to set it aside because he
has acquired the shares of the person injured, is exposed
in such cases as *Graham v. La Crosse & M. R. Co.*, 102 U.
S., 148, 26 L. Ed., 106, and *Hoffman v. Bullock*, 34 Fed.
Rep., 248. The right to complain of such transactions is
one which the stockholders injured may or may not ex-
ercise as they choose. Where such transactions are not
absolutely void, they may, if they so elect, acquiesce and
treat them as binding. The discretion whether to sue to
set them aside or to acquiesce in and agree to them is
incapable of transfer. If the new stockholder is injured,
there is another question. In that case he also has a
power of proceeding or remaining inactive as he may
prefer. Where he is not injured, he can take no advantage
of the power which was in his vendor and the latter did
not care to exercise. In *Graham v. La Crosse & M. R. Co.*,
*supra*, the point was urged which is so often made in con-
nection with suits by subsequent stockholders, and upon

which Mr. Morawetz bases his statement that such stockholders should be allowed to sue. Bradley, J., says (p. 153) : "But it is contended that this is a case in which the debtor corporation was defrauded of its property, and that, as the company had a right of proceeding for its recovery, any of its judgment and execution creditors have an equal right; that it is a property right, and one that inures to the benefit of creditors. Conceding that creditors who were such when the fraudulent procurement of the debtor's property occurred * * * the question still remains, whether * * * subsequent creditors have such an interest that they can reach the property for the satisfaction of their debts. We doubt whether any case, going as far as this, can be found. * * * It seems clear that subsequent creditors have no better right than subsequent purchasers, to question a previous transaction in which the debtor's property was obtained from him by fraud, which he has acquiesced in, and which he has manifested no desire to disturb. Yet, in such a case, subsequent purchasers have no such right." Hence, upon review of the authorities and the principles on which they appear to proceed, notwithstanding the position of some of the text-writers, the sounder doctrine, sustained by the better and more numerous adjudications, appears to be that subsequent stockholders have no standing, as a general rule, to attack prior mismanagement of the corporation.

It appears to be well settled, also, that stockholders who have acquired their shares and their interest in the corporation from the alleged wrong-doers and through the prior mismanagement have no standing to complain thereof. *Brown v. Duluth, M. & N. R. Co.*, 53 Fed. Rep., 889; *Matter of Application of Syracuse, C. & N. Y. R. Co.*, 91 N. Y., 1; *Schilling & Schneider Brewing Co. v. Schneider*, 110 Mo., 83, 19 S. W. Rep., 67; *Langdon v. Fogg*, 14 Abb. N. Cas. [N. Y.], 435; *Parsons v. Hayes*, 18 Jones & Sp. [N. Y.], 29; *Hollins v. St. Paul, M. & M. R. Co.*, 9 N. Y. Supp., 909; *Clark v. American Coal Co.*, 86 Ia., 436, 53 N. W. Rep., 291, 17 L. R. A., 557; 4 Thompson,

Corporations, p. 3410; Cook, Corporations, secs. 40, 736, note. If a stockholder's predecessor in title has acquiesced in a course of mismanagement, it has even been held that he can not maintain a suit to restrain its continuance. *Trimble v. American Sugar Refining Co.*, 61 N. J. Eq., 340, 48 Atl. Rep., 912. In Thompson, Corporations, *supra,* the learned author says (p. 3409) : "But as share certificates do not, under any theory, rise to the grade of strictly negotiable paper, it should follow, and especially in regard to the transfer of any litigious rights which may attach to them, that their holder can not, by selling them to another, transfer to that other any better litigious rights, inhering in them, than he himself possesses. If, therefore, he has, by his conduct as a shareholder, estopped himself from maintaining a suit in equity to undo corporate action, * * * this estoppel will attend the shares in the hands of his vendee." In consequence, it would make no great difference in the case at bar, as to the standing of the present shareholders of the company in a court of equity, if we held that subsequent shareholders could attack prior mismanagement. The present shareholders hold 260 shares through a purchase from Barber, who acquired title through the acts complained of, and the money which they paid for those very shares, which they hold through such purchase, is now claimed to belong to the corporation, and is sought to be recovered from their vendor. Nor is this all. The greater part of the remaining shares were held by Barber and his associates when the alleged wrongs were committed, and are now held by the present stockholders under a purchase from Barber. To allow them to open up these transactions is to allow them to go counter to their own title to a large part of the stock, and to assert rights and claims which their vendor could never have asserted, and this, too, as to past transactions, which have no present effect upon the value of their stock, and do not continue to be felt in any way in the corporate management.

There is another and still stronger reason why the

present stockholders have no standing in a court of equity to complain of the transactions on which this suit is based. To permit them to recover, under the circumstances of the case at bar, would be highly inequitable. It would be to give them moneys to which they have no just title or claim whatever, and enable them to speculate upon wrongs done to others with which they have no concern. It would enable them to recover back a large part of the purchase-money they paid and agreed to pay for the stock, notwithstanding the stock was worth all that they paid for it, and notwithstanding they obtained and now retain all that they bargained for. So long as they received all that was contracted for, there is no equity in allowing them to recover back a considerable portion of what they paid, merely because their vendor had previously wronged some one else who could have obtained redress in the name of the corporation which they are now able to use. This is especially manifest in respect to the dividends. As Barber and his associates acquired shares by unauthorized borrowings of the company's money, and so held them in trust for the corporation, as representing all the then stockholders, in equity the dividends paid upon such shares doubtless were received impressed with the same trust. But who were the beneficiaries of that trust? Not the other stockholders only, but Barber and his associates, together with such remaining stockholders. Barber and his associates held most of the stock outside of the shares in question. Instead of receiving all the dividends on those shares, they should have received, in equity, the greater portion only. Had a stockholder gone into equity at that time and recovered the dividends for the company, they would simply have been for distribution among those who held the shares not subject to a trust for the company, and Barber and his associates would still have been the heaviest beneficiaries. For it is well settled that a recovery in such case inures to the benefit of all stockholders, as well those who were wrong-doers as those who were innocent. 4 Thompson, Corporations, sec. 4491. But after an entirely

new set of stockholders have come in, holding these shares under Barber and his associates and the remainder of the latters' shares under purchase from them, to let them recover back these dividends is to let them reclaim over fifty per cent. of the purchase-money, and recover from Barber moneys which in equity belonged to him when he took them. The fact that a relatively small portion belonged to others can not alter the unconscionable character of such a recovery, so long as the present stockholders are not those others and have no standing in equity as their representatives. Recovery by or for the benefit of the present stockholders means, to put it plainly, that through the instrumentality of a court of equity they are to get shares, worth by their own valuation $115 each, for $55 each; are to get back-dividends which never would have been payable to them in any event and were not bargained for when they bought, and are to receive, in addition to the shares worth $1.15 on the dollar, 60 cents more on each dollar, imposed on Barber for his delinquencies. Barber wronged the old stockholders. His conduct in many respects was unconscionable and indefensible. But his fellow-stockholders were supine for many years. They took no steps to investigate what he was doing, or to protect or assert their rights. Now third parties, who bought all of Barber's shares, including those which he held as a result of his wrongful manipulations, seek to assert those rights and reap a profit thereby. Because the inequitable conduct of Barber shocks the conscience of a chancellor is no reason why he should give his conscience a further shock by allowing Funkhouser and his associates to recover money to which they have no legal or equitable claim.

Conceding, then, that all of the present stockholders are so circumstanced that no relief should be afforded them in a court of equity, may the corporation recover, notwithstanding? We think not. Where a corporation is not asserting or endeavoring to protect a title to property, it can only maintain a suit in equity as the representative of its stockholders; if they have no standing in equity to

entitle them to the relief sought for their benefit, they can
not obtain such relief through the corporation or in its
name. *Arkansas River Land, Town & Canal Co. v. Farm-
ers' Loan & Trust Co.*, 13 Colo., 587, 22 Pac. Rep., 954;
*Des Moines Gas Co. v. West*, 50 Ia., 16; *Schilling &
Schneider Brewing Co. v. Schneider*, 110 Mo., 83, 19 S. W.
Rep., 467; *Flagler Engraving Machine Co. v. Flagler*, 19
Fed. Rep., 468; *Parsons v. Hayes*, 14 Abb. N. Cas. [N. Y.],
419; *Langdon v. Fogg*, 14 Abb. N. Cas. [N. Y.], 435. It
would be a reproach to courts of equity if this were not so.
If a court of equity could not look behind the corporation
to the shareholders, who are the real and substantial bene-
ficiaries, and ascertain whether these ultimate beneficiaries
of the relief it is asked to grant have any standing to
demand it, the maxim that equity looks to the substance
and not the form would be very much limited in its ap-
plication. "It is the province and delight of equity to
brush away mere forms of law." Post, J., in *Fitzgerald
v. Fitzgerald & Mallory Construction Co.*, 44 Nebr., 463,
492. Nowhere is it more necessary for courts of equity to
adhere steadfastly to this maxim, and avoid the danger of
allowing their remedies to be abused, by penetrating all
legal fictions and disguises, than in the complex relations
growing out of corporate affairs. Accordingly, courts and
text-writers have been in entire agreement that equity will
look behind the corporate entity, and consider who are
the real and substantial parties in interest, whenever it
becomes necessary to do so to promote justice or obviate
inequitable results. In 4 Thompson, Corporations, sec.
4479, the learned author says: "As in point of substance
and sense, the corporation consists of the aggregate body
of its shareholders, it is obvious that, in the most sub-
stantial sense, the directors are trustees for the share-
holders, and that in any action to redress breaches of trust
on the part of the directors, the shareholders are the real
parties in interest." Again: "For the purpose of sub-
stantial right, though not for the conveniences of legal
procedure, the aggregate body of shareholders in a joint

stock company should be deemed the corporation." 1
Thompson, Corporations, sec. 17. Mr. Morawetz also
writes very cogently to the same effect: "It is essential
to a clear understanding of many branches of the law of
corporations to bear in mind distinctly, that the existence
of a corporation independently of its shareholders is a fic-
tion; and that the rights and duties of an incorporated
association are in reality the rights and duties of the per-
sons who compose it, and not of an imaginary being."
1 Morawetz, Private Corporations, sec. 1. "While a cor-
poration may, from one point of view, be considered as
an entity without regard to the corporators who compose
it, the fact remains self-evident that a corporation is not
in reality a person or thing distinct from its constituent
parts. The word 'corporation' is but a collective name for
the corporators or members who compose an incorporated
association." 1 Morawetz, Private Corporations, sec. 1. In
*Moore v. Schoppert*, 22 W. Va., 282, 290, the court say:
"The relation between a corporation and its several
members may, for all practical purposes, be treated as
that of trustee and *cestui que trust*. In contemplation of
law, the property and rights of an incorporated company
belong to the united association acting in the corporate
name, and not to the stockholders. The latter, however,
are the real owners; and a technical trust thus arises in
their favor, which will be protected and enforced by the
courts of equity."

This principle that in equity the corporation is regarded
as a trustee for those who are the ultimate substantial
beneficiaries of what is held and acquired in the corporate
name, finds many important illustrations in various de-
partments of the law of corporations. Thus it has been
held that a sole stockholder may be treated in equity as
the corporation, when the equities of a case so require.
*Swift v. Smith,* 65 Md., 428, 57 Am. Rep., 336; 7 Thomp-
son, Corporations, sec. 8403; 4 Thompson, Corporations,
sec. 5097. The case of *Swift v. Smith* has been criticised,
as we think with some reason, so far as it deals with the

sole stockholder as if he had some title to the property. But so far as it sustains the proposition that between the corporation and the stockholder the latter is to be recognized as the real beneficiary, and consequently that equitable rights and remedies the benefit whereof would inure solely to the shareholder are to be regarded as exercised for him by the corporation, and not as something belonging to it independently, the decision is in accord with the authorities. It has also been applied frequently where acts have been done or assented to by the whole body of shareholders and attempt has been made to evade liability by conjuring with the corporate name. 1 Morawetz, Private Corporations, sec. 262; *Sheldon Hat Blocking Co. v. Eickemeyer Hat Blocking Machine Co.*, 90 N. Y.; 607, 613; *Omaha Hotel Co. v. Wade*, 97 U. S., 13, 23, 24 L. Ed., 917. Another case where this principle comes into play is to be seen in attempts to place property beyond the reach of creditors by fraudulent incorporations. In such cases, courts do not hesitate to look behind the corporation to the real and substantial beneficiaries. *First Nat. Bank of Chicago v. Trebein Co.*, 59 Ohio St., 316, 52 N. E. Rep., 834; *Terhune v. Hackensack Savings Bank*, 45 N. J. Eq., 344, 19 Atl. Rep., 377; *Kellogg v. Douglas County Bank*, 58 Kan., 43, 48 Pac. Rep., 587; 62 Am. St. Rep., 596; *Lusk v. Riggs*, 65 Nebr., 258. In *First Nat. Bank v. Trebein Co.* the court say (p. 326): "The fiction by which an ideal legal entity is attributed to a duly formed incorporated company, existing separate and apart from the individuals composing it, is of such general utility and application as frequently to induce the belief that it must be universal, and be, in all cases adhered to, although the greatest frauds may thereby be perpetrated under the fiction as a shield. But modern cases, sustained by the best text-writers, confine the fiction to the purposes for which it was adopted." It has likewise been applied to cases of estoppel. Thus Mr. Thompson says: "We may also conclude from the premise that the body of stockholders are in substance the corpora-

tion, that estoppels are concurrent as between the stockholders and the corporation,—in other words, that whatever will estop the stockholders will estop the corporation, and whatever will estop the corporation will estop the stockholders." 4 Thompson, Corporations, sec. 5269. But the commonest instance of application of this principle is in stockholders' suits for mismanagement. Ordinarily such suits are to be brought in the name of the corporation, at the instance of the corporate authorities. But where, for some reason, this course is not open, the stockholders injured will not be deprived of all remedy, but upon proper showing will be permitted to sue directly by joining the corporation as a defendant. The very basis of these suits is that "courts of equity recognize that the stockholders are ultimately the only beneficiaries." *City of Chicago v. Cameron,* 120 Ill., 447, 457. Stockholders are allowed to sue in order to obtain redress for such wrongs because "in their effect and essential character they are wrongs to the individual shareholder, inflicted upon his corporate interests by means of the control over those interests secured through the corporate organization and management." *Brewer v. Boston Theatre,* 104 Mass., 378, 395. See also *State v. Holmes,* 60 Nebr., 39, 42. It is but another application of the same principle to hold that where no question of title is involved, but some equitable remedy is sought in the corporate name, depending purely upon the doctrines of a court of equity, the court, to prevent abuse and perversion of its doctrines and remedies, will look through the corporation to the real parties in interest, and, if those parties have no standing in equity, will refuse the remedy.

Cases of this kind must be differentiated sharply from those where the proceeding is at law, or where a question of title to the corporate property is involved. There is no question that stockholders, as such, have no title to the corporate property which they can convey or incumber in their own names. *Humphreys v. McKissock,* 140 U. S., 304, 11 Sup. Ct. Rep., 779, 85 L. Ed., 473; *Wheelock*

*v. Moulton*, 15 Vt., 519; *Smith v. Hurd*, 12 Met. [Mass.], 371, 385, 46 Am. Dec., 690; *Parker v. Bethel Hotel Co.*, 96 Tenn., 252, 34 S. W. Rep., 209, 31 L. R. A., 706; *Button v. Hoffman*, 61 Wis., 20, 50 Am. Rep., 131; *Spurlock v. Missouri P. R. Co.*, 90 Mo., 199. But this, in substance, is only another way of saying that the corporation must act through its proper agents and in the prescribed way. 4 Thompson, Corporations, sec. 4476. It is also true, for convenience of legal procedure and to avoid confusion, that restitution or redress, even where the injury has affected the interests of the stockholders, is to be sought primarily through the corporation. But this rule must always yield to the requirements of equity, and is cast aside in view of the fact that the stockholders are the real beneficiaries whenever the usual course is not open. *Brewer v. Boston Theatre, supra;* 4 Thompson, Corporations, sec. 4477. Cases like the one at bar are obviously within the same reason. To permit persons to recover through the medium of a court of equity that to which they are not entitled, simply because the nominal recovery is by a distinct person through whom they receive the whole actual and substantial benefit, and that nominal person would, in ordinary cases, as representing beneficiaries having a right to recover, be entitled to relief, is a perversion of equity. It turns principles meant to do justice into rules to be administered strictly without regard to the result. It is contrary to the very genius of equity. When the corporation comes into equity and seeks equitable relief, we ought to look at the substance of the proceeding, and if the beneficiaries of the judgment sought have no standing in equity to recover, we ought not to become befogged by the fiction of corporate individuality, and apply the principles of equity to reach an inequitable result.

Hence, we think the rule to apply to such cases is this: Where a corporation is proceeding at law, or where it is asserting a title to property, or the title to property is involved, the corporation is regarded as a person separate

and distinct from its stockholders, or any or all of them. But where it is proceeding in equity to assert rights of an equitable nature, or is seeking relief upon rules or principles of equity, the court of equity will not forget that the stockholders are the real and substantial beneficiaries of a recovery, and if the stockholders have no standing in equity, and are not equitably entitled to the remedy sought to be enforced by the corporation in their behalf and for their advantage, the corporation will not be permitted to recover. This rule finds many illustrations in the authorities.

In *Arkansas River Land, Town & Canal Co. v. Farmers' Loan & Trust Co.*, 13 Colo., 587, 22 Pac. Rep., 954, the court said (p. 598): "It is true that, for some purposes, a body corporate is sometimes regarded as a legal entity, or a fictitious person having a distinct existence. This fiction is not recognized in equity. The reason is clear. Without organization and members, without officers and stockholders, a corporation is but a naked body. It may be authorized to exercise corporate franchises, but is without means or instrumentalities for such exercise. It is clear, therefore, that a body corporate can not maintain a suit for equitable relief, except as the representative of the stockholders. It necessarily follows that if the shareholders are without equity they can not, through the corporate organization, or in its name, obtain relief either for themselves or for the corporation. 'In equity the conception of a corporate entity is used merely as a formula for working out the rights and equities of the real parties in interest, while at law this figurative conception takes the shape of a dogma, and is often applied rigorously, without regard to its true purpose and meaning. In equity the relationship between the shareholders is recognized whenever this becomes necessary to the attainment of justice; at law this relationship is not recognized at all.' 1 Morawetz, Private Corporations, 227. At the very outset of the discussion, then, it must be assumed that, in a suit of this nature, the corporation and

the individual plaintiffs can not be separated. It follows that, if the individual plaintiffs are not entitled to relief, as counsel admits, the corporation is not, and the judgment dismissing the bill might, very properly, be affirmed without further discussion."

In *Parsons v. Hayes*, 14 Abb. N. Cas. [N. Y.], 419, 431, the court say: "Again, considering that the fundamental position is, that Catlow became, in fact, shareholder to the amount of all the capital stock, the following was the relation between the parties: The corporation was the holder of the legal title of the property of the corporation, subject to corporate uses. Excepting this legal title for corporate uses, the shareholders were the parties interested in the property, in fact, owning all of it, excepting the legal title, which, as against them, could be used for corporate purposes. The trustees were the statutory corporation. The shareholders were members or a part of the corporation. The corporation held the legal title for the pecuniary benefit of the shareholders having no beneficial or pecuniary benefit in it. On the claims for the plaintiff, the thing possessed is the right of the corporation to have an action against its trustees for damages for their acts, which it is claimed were wrongful to the corporation. This right, if it existed, was held by the same tenure and for the same purposes that other property would be held. The corporation would have a bare title to it for the beneficial use of shareholders. It seems to be evident, that the corporation could not claim damage to its interest what would be damage to the beneficial interest, when the owners of the latter had consented to the so-called injury."

In *Flagler Engraving Machine Co. v. Flagler*, 19 Fed. Rep., 468, the promoters and directors of a corporation put in certain patent rights as part of its capital. Afterwards by fraudulent practices they induced others to buy stock at extravagant prices. The purchasers got control of the corporation and brought a suit in equity in the name of the corporation against the former directors for

mismanagement. The court said that the purchasers
might have a right to set aside the sales of stock made
to them through fraud, but that they could not, by obtain-
ing control of the company, set up an artificial case and
recover through the company what was really their loss
individually, and not as stockholders.

In *Schilling & Schneider Brewing Co. v. Schneider,* 110
Mo., 83, 19 S. W. Rep., 67, a corporation brought suit
against certain stockholders to have shares which they
held declared to be the property of the corporation. The
court treated the remaining stockholders as the real par-
ties in interest, and expressly referred to them as such,
and held that as their predecessors in interest could not
have complained of the use of money of the corporation
in acquiring the shares, the stockholders in whose interest
the suit was brought could not do so in their own name
or in that of the corporation.

The only decision which has been cited to the contrary
is *Fitzgerald v. Fitzgerald & Mallory Construction Co.,*
41 Nebr., 374, 429. There it was held that a suit for mis-
management was maintainable in equity as to a transac-
tion in which four-fifths of the stockholders participated
and the remainder acquiesced. There had been no change
in the stockholders. Suit was brought by one who had
acquiesced to recover for the benefit of the corporation.
It was said that the action was for the benefit of the cor-
poration, which was a distinct person, and was not
affected by the circumstance that the stockholder himself
was in no position to complain. But a rehearing was
granted, if we may judge from the motion and brief of
counsel, on this very ground; and upon rehearing this
branch of the case was decided upon an entirely different
point, namely, that there had been no acquiescence on the
part of the complaining stockholder. *Fitzgerald v. Fitz-
gerald & Mallory Construction Co.,* 44 Nebr., 463. Hence,
while there is no express retraction of the statement in
the former opinion, we are satisfied that the court in-
tended to recede from it, and that we are not bound

thereby. We reach this conclusion the more readily because the proposition that acquiescence of all the stockholders does not preclude the right of the corporation to relief, as advanced in the first opinion, is contrary to the uniform and long established course of decision in all courts, and the understanding of all writers upon the subject. 2 Cook, Corporations, secs. 278, 279; 4 Thompson, Corporations, sec. 5269; 2 Beach, Private Corporations, sec. 887; 1 Morawetz, Private Corporations, secs. 262-264. The adjudications to the same effect as the statements of the text-writers cited are legion.

But it is said the defendant Barber, by reason of his delinquencies, is in no position to ask that the court look behind the corporation to the real and substantial parties in interest. The trial court took this view, saying: "I have come to the conclusion that, there being no equities in this case in favor of Mr. Barber, it is not the duty of this court to look behind the entity of the corporation." We do not think such a proposition can be maintained. It is not the function of courts of equity to administer punishment. When one person has wronged another in a matter within its jurisdiction, equity will spare no effort to redress the person injured, and will not suffer the wrong-doer to escape restitution to such person through any device or technicality. But this is because of its desire to right wrongs, not because of a desire to punish all wrong-doers. If a wrong-doer deserves to be punished, it does not follow that others are to be enriched at his expense by a court of equity. A plaintiff must recover on the strength of his own case, not on the weakness of the defendant's case. It is his right, not the defendant's wrong-doing, that is the basis of recovery. When it is disclosed that he has no standing in equity, the degree of wrong-doing of the defendant will not avail him. This principle can hardly need demonstration; but abundant illustrations are at hand. For instance, a creditor can not complain of a fraudulent conveyance by his debtor unless he is injured thereby. *Baldwin v. Burt*, 43 Nebr., 245.

The conduct of the debtor may have been ever so fraudulent. But if it appears that the creditor has not been prejudiced, he acquires no right merely from the evil intent of unconscientious acts of the debtor. Another example may be seen in *Roberts v. Northern P. R. Co.*, 158 U. S., 1, 13, 15 Sup. Ct. Rep., 756, 39 L. Ed., 873. In that case a county had granted land to a railroad company without authority, and the grant, under statutes and decisions of the state, was of no effect. Afterwards the county sold the same land to an individual. The court said: "Whatever might be the result in a court of law of a contest between these respective grantees of the county, it may well be doubted whether a court of equity could be successfully appealed to by a purchaser from the county of property worth upwards of two hundred thousand dollars for a nominal consideration of less than four hundred dollars. If the county had found that it had been overreached in its bargain with the railroad company, or had learned that its grant of these lands was invalid for want of power, and had come into a court of equity, offering to do equity by an offer to return or account for the consideration received, the condition of things would have been different from what it now is. In such a proceeding the rescission would have inured to the benefit of the taxpayers of the county; but under the present claim, the benefit would go to a private party, who bought with knowledge of the county's previous sale, and who admits in his answer that he secured his own grant for a grossly inadequate consideration because of the fact of such previous sale." In other words, the wrong-doing of the defendant will not blind a court to the fact that the plaintiff may have no standing in equity.

Counsel say that the court will not look through the corporation to the real plaintiffs in order to preserve to Barber the fruits of his wrong-doing. If such were the only purpose, we should agree. But the court will bear in mind the real parties in interest, in order to prevent those parties from misusing equitable rules and remedies

to obtain relief to which they have no right, and recover back money which they paid out voluntarily upon full consideration, without any deception, and to which they can assert no legal claim whatever.

Turning, now, to those items which involve withdrawal of money and assets of the company by Barber and conversion thereof to his own use, it must be evident that the foregoing discussion does not apply thereto. So far as its title to property and its right to its money and assets are concerned, a clear distinction between the company and its stockholders is always drawn. As we have seen, even if Barber had owned all the stock in the company, he would have had no title to the corporate property, so far as to be able to deal with it in his own rather than in the corporate name. But he was only a majority stockholder. When he withdrew money or assets of the corporation and converted it to his own use, there was as clear a conversion as if the transaction had taken place between natural persons. If he concealed and covered up these transactions by availing himself of the opportunities afforded him as secretary and manager of the company, and they were not discovered until a change in management resulted in an investigation of the books, we see no reason why the company should not recover the sums so misappropriated. We are therefore of opinion that so far as relates to the $3,000 converted under pretense of payment to Reynolds and Lovett for services as lobbyists, detailed in the twenty-third finding of the district court, and the conversion of the various collections, detailed in the twenty-ninth finding, the plaintiff should have judgment. We think, likewise, that it ought to recover the interest on the mortgage loan as found in the sixteenth finding. The trial court held that this loan was made in good faith, was duly entered on the books of the company and properly secured and acquiesced in by the company and its officers. But it further found that a large amount of interest on the loan remained unpaid. There is nothing

49

in the record to justify any inference, much less a finding, that Barber was not to pay all the interest on this loan. He had charge of the books and accounts of the company, and the evidence shows conclusively that he manipulated them in many ways so as to conceal the true nature of his dealings and the actual condition of the transactions between himself and his employer. As to this item of interest, the case stands the same as any other between debtor and creditor.

The same considerations apply to the money withdrawn on November 20, 1899. Unless the claim for back-salary is a just and valid one, this was simply a conversion of that amount of money of the company. It becomes necessary, therefore, in this connection, to pass upon the issues as to Barber's claim for unpaid salary, since the company has filed a cross-appeal from that portion of the decree in which such claim is allowed. Undoubtedly, as a general rule, when parties have contracted for performance of certain services for a definite period at a fixed salary, and the employment continues beyond the period agreed upon, in the absence of any new contract, it will be presumed that the employment continued under the same contract and upon the terms originally fixed. *Wallace v. Floyd*, 29 Pa St., 184, 72 Am. Dec. 620; *Crane Bros. Mfg. Co. v. Adams*, 142 Ill., 125, 30 N. E. Rep., 1030. But this presumption must yield to evidence showing a change of terms. *Hale v. Sheehan*, 41 Nebr., 102; *McCullough Iron Co. v. Carpenter*, 67 Md., 554; *Commonwealth Ins. Co. v. Crane*, 6 Met. [Mass.], 64. It may be conceded that it would take two to make the new agreement, and that a mere intention on the part of Barber to accept a less sum, or even an express statement by him that he would accept the less sum, would not of itself bind him so to do. *Richard Thompson Co. v. Brook*, 14 N. Y. Supp., 370. In that case certain employees of a corporation agreed among themselves to accept a reduction of salary. The corporation was not a party to the agreement, and it was never communicated to or acted on by the corpora-

tion or its directors.   Such a case is very different from
the one at bar.   Here, while there was no action by the
corporation expressly, the court has found that from the
time Barber as general manager reduced his own salary,
along with the salaries of other employees, to the time
he ceased to be an officer of the company, he drew his
salary from time to time substantially on the basis of the
reduction; and the evidence is clear and convincing that
he took the money withdrawn in full satisfaction of his
claim for salary, and had no thought of claiming more
until his right to withdraw the $2,200 was challenged
after the new management took charge.   We think these
circumstances are sufficient to show that the company
relied on his voluntary action in reducing his own salary,
and took no express action thereon, because none was
necessary, and that it was understood by both parties that
his salary was that which he had voluntarily fixed upon.
In *Shade v. Sisson Mill & Lumber Co.*, 115 Cal., 357, 47
Pac. Rep., 135, the corporation rendered statements
monthly to an employee, in which he was credited with a
less salary a month than he should have received.   It
was held that the employee, by acquiescence in these
statements so rendered him, was estopped to claim after-
wards a salary in excess of that for which he was given
credit.   So long as Barber's reduction of his own salary
was carried out by himself for a long series of years, and
even at the time when he withdrew the $2,200 he did not
claim the right to withdraw any such sums as would be
due to him if his present claims were allowed, we see no
ground whatever on which to sustain the judgment in his
favor in this behalf.   Hence we are of opinion that the
company should recover the item of $3,000 converted on
April 17, 1895, the item of $237.37 for collections un-
accounted for, the unpaid interest on the mortgage loan,
amounting at the date of the decree in the lower court
to $1,510, and the item of $2,200 withdrawn on November
20, 1899.

It is therefore recommended that the decree of the

district court be reversed, and the cause remanded with directions to enter a new decree in favor of the plaintiff and against the defendant Barber for the several sums last above stated and interest thereon at the rate by law provided. We further recommend that each party pay his own costs in this court.

BARNES and OLDHAM, CC., concur.

By the Court: For the reasons stated in the foregoing opinion the judgment of the district court is reversed, and the cause is remanded with directions to enter a new judgment in favor of the plaintiff and against the defendant Barber in accordance with said opinion. It is further ordered that each party pay his own costs in this court.

REVERSED AND REMANDED.